THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNADEAN RITTMANN, *et al.*,

                Plaintiffs,

      v.

AMAZON.COM, INC., *et al.*,

                Defendants.

CASE NO. C16-1554-JCC

ORDER

This matter comes before the Court on Defendants' motion to compel arbitration (Dkt. No. 36). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

## I.    BACKGROUND

Plaintiffs are delivery drivers working for Defendants Amazon.com or Amazon Logistics. (Dkt. No. 76 at 1.) Plaintiffs are parties to individual contracts with Defendants (collectively, the "contract"), and Defendants have classified Plaintiffs as independent contractors.[1] (*Id.*) Of the tens of thousands of putative class members, all but approximately 165 are parties to a contract

---

[1] There are actually two relevant types of contracts at issue, but they are substantively the same. (*Compare* Dkt. No. 37-1 at 4–5, *with* Dkt. No. 37-2 at 6–7.) Any reference in this order to the terms of one type of contract is applicable to the other.

1   with Defendants containing a provision mandating individual arbitration (the "Arbitration

2   Provision"). (*See* Dkt. Nos. 49 at 4, 77 at 2, 37-1, 37-2.) The Arbitration Provision further

3   mandates that the Federal Arbitration Act ("FAA") will govern any disputes arising between the

4   parties. (*See* Dkt. Nos. 37-1 at 5, 37-2 at 7.)

5          Directly after the contract's Arbitration Provision, a provision entitled "Governing Law"

6   (the "Governing Law Provision") states: "These Terms are governed by the law of the state of

7   Washington without regard to its conflict of laws principles. However, the preceding sentence

8   does not apply to [the Arbitration Provision], which is governed by the Federal Arbitration Act

9   and applicable federal law." (Dkt. No. 37-1 at 5.)

10          At the heart of Plaintiffs' complaint is their allegation that Defendants have misclassified

11   Plaintiffs as independent contractors instead of employees. (*See* Dkt. No. 83.) Simultaneous to

12   when this lawsuit was filed, the Ninth Circuit and the United States Supreme Court were poised

13   to answer questions relevant to the arbitrability of Plaintiffs' claims. (*See* Dkt. No. 77.) As a

14   result, the Court stayed this action, pending those decisions. (*Id.*) Those questions have now been

15   answered, and the parties stipulate to a partial lift of the stay so that the Court can determine the

16   arbitrability of Plaintiffs' claims. (*See* Dkt. Nos. 100, 101.)

17   **II.    DISCUSSION**

18         **A.    Federal Arbitration Act**

19          Arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds

20   as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 ("Section 2"). The

21   Supreme Court has held that Section 2 should be construed broadly to "provide for the

22   enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry v.*

23   *Thomas*, 482 U.S. 483, 490 (1987). Because of the FAA's broad reach, the Court is limited to

24   "determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the

25   agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114,

26   1119 (9th Cir. 2008) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130

(9th Cir. 2000)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Plaintiffs argue that there is no valid agreement to arbitrate because the Arbitration Provision is unenforceable, as Plaintiffs fall within the exemption to the FAA codified at 9 U.S.C. § 1 ("Section 1" or the "transportation worker exemption").[2] (Dkt. Nos. 46, 104, 107.) Section 1 exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The parties dispute whether Plaintiffs are engaged in interstate commerce.[3] (Dkt. Nos. 103, 104, 107, 108.)

In contrast to Section 2, Section 1 is construed narrowly. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"). As a result, many courts in the Ninth Circuit have construed the transportation worker exemption to require a stricter association between the employee and interstate commerce than might otherwise be required under other legislation. *See, e.g., Magana v.*

---

[2] In their initial briefing, Plaintiffs made two additional arguments that are without merit. (*See* Dkt. Nos. 46 at 15–21, 62 at 22.) First, they argued that the Arbitration Provision is unenforceable because it contains a class action waiver, in violation of the National Labor Relations Act ("NLRA"). (Dkt. No. 46 at 15–21.) However, the Supreme Court has clarified that "[n]othing in our cases indicates that the NLRA guarantees class and collective action procedures, let alone for claims arising under different statutes and despite the express (and entirely unmentioned) teaching of the Arbitration Act." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1628 (2018). In their supplemental briefing, Plaintiffs make no mention of their NLRA argument, and the Court concludes that they are no longer pursuing it.

Second, Plaintiffs argued that the Arbitration Provision is unenforceable because, under the Fair Labor Standards Act, employees' rights to bring a collective action are not waivable. (*See* Dkt. No. 62 at 22.) However, the Ninth Circuit has rejected that argument. *See Horenstein v. Mortg. Mkt., Inc.*, 6 F. App'x 618, 619 (9th Cir. 2001).

[3] Prior to the Supreme Court's decision in *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019), the parties disputed whether Plaintiffs were subject to a "contract of employment." (*See* Dkt. Nos. 62 at 24–25, 68 at 14–17.) The parties now appear to agree that *New Prime* clarifies that Plaintiffs are subject to a contract of employment. (*See* Dkt. Nos. 103, 104.)

*DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal. 2018); *Bonner v. Mich. Logistics Incorp.*, 250 F. Supp. 3d 388, 397 (D. Ariz. 2017); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152–54 (N.D. Cal. 2015); *Lee v. Postmates Inc.*, 2018 WL 6605659, slip op. at 7 (N.D. Cal. 2018). Courts in this circuit have recognized that, in order for a delivery driver to qualify for the transportation worker exemption, the delivered good must have originated, or transformed into its final condition, in a different state than the delivery state. *See Magana*, 343 F. Supp. 3d at 899; *Levin*, 146 F. Supp. 3d at 1152–54; *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, slip op. at 3–5 (N.D. Cal. 2016). In this case, Plaintiffs deliver packaged goods that are shipped from around the country and delivered to the consumer untransformed. The Court concludes that Plaintiffs' work is readily distinguishable from the workers discussed in the above-cited case law.

For example, in *Lee v. Postmates*, the court found that the plaintiffs had not established that they fell within the transportation worker exemption because they "do not cite any case holding that making only local deliveries, *for a company that does not hold itself out as transporting goods between states*, constitutes engaging in interstate commerce within the meaning of the statute." *Lee*, 2018 WL 6605659, slip op. at 7 (emphasis added). But here, Defendants are akin to UPS and FedEx—they are widely known as a company able to transport goods across the country to consumers in a couple of days. To be sure, Defendants admit that they historically contracted with UPS and FedEx for the services that Plaintiffs now provide. (Dkt. No. 37 at 2.)

And in *Levin v. Caviar*, the court found that local food delivery did not constitute interstate commerce, despite the fact that the ingredients had travelled interstate, because the ingredients "ended their interstate journey when they arrived at the restaurant where they were used to prepare meals." *Levin*, 146 F. Supp. 3d at 1154. Again, this case is different: Defendants are in the business of delivering packages and goods across the country that are not transformed or modified during the shipping process. Plaintiffs deliver goods in the same condition as they

1  were shipped, and the goods are shipped around the country.

2      In *Vargas v. Delivery Outsourcing*, the court found that the plaintiff did not fall within

3  the transportation worker exemption, despite the fact that he was in the business of delivering

4  delayed airline luggage to its owners. *Vargas*, 2016 WL 946112, slip op. at 1, 3–5. But in

5  *Vargas*, the luggage was not a "good" to be delivered until it was delayed or lost by the airline

6  and then discovered when it was already intrastate. *See id.* Much like a food delivery service, a

7  luggage delivery service is not engaged in interstate commerce because it is not in the business

8  of shipping goods across state lines, even though it delivers goods that once travelled interstate.

9  As mentioned above, Defendants are in the business of shipping goods across state lines.

10     Several out-of-circuit cases are more relevant to the facts at issue here because they have

11 dealt with goods that often travel interstate without transformation. For example, in *Palcko v.*

12 *Airborne Express*, the Third Circuit found that the plaintiff supervisor, who did not deliver

13 packages herself, fell within the transportation worker exemption because she supervised

14 employees who delivered packages, even though those employees' delivery routes were entirely

15 intrastate. *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 590, 593 (3d Cir. 2004); *see also*

16 *Zamora v. Swift Transp. Corp.*, 2008 WL 2369769, slip op. at 9 (W.D. Tex. 2008). In *Palcko*, the

17 package delivery at issue involved the interstate shipment of untransformed goods, unlike

18 prepared food delivery.

19     And in *Christie v. Loomis Armored US*, the court found that the plaintiff fell within the

20 transportation worker exemption, even though he travelled strictly intrastate, because he

21 delivered currency, "a good that is undisputedly in the stream of interstate commerce." *Christie*

22 *v. Loomis Armored US, Inc.*, 2011 WL 6152979, slip op. at 3 (D. Colo. 2011). The *Christie* court

23 reasoned that a delivery person "need not actually transport goods across state lines to be part of

24 a class of employees engaged in interstate commerce." *Id.*

25     Consider the following hypothetical: A national freight company delivers finished goods

26 to individuals and businesses using a series of distribution centers located across the country.

ORDER
C16-1554-JCC
PAGE - 5

1   The company employs both "long-haul" and "short-haul" drivers—the former transporting goods

2   from distribution center to distribution center, the latter from distribution center to customer. A

3   distribution center in Northern California receives a shipment of mattresses from New York,

4   some of which are then transported by a long-haul driver to a distribution center in Southern

5   California, others of which are delivered by a short-haul driver to a customer in Southern

6   Oregon. The long-haul truck driver would not be any less subject to the transportation worker

7   exemption than the short-haul truck driver, whose route happens to cross state lines. If an

8   employer's business is centered around the interstate transport of goods and the employee's job

9   is to transport those goods to their final destination—even if it is the last leg of the journey—that

10  employee falls within the transportation worker exemption.[4]

11          Finally, when deciding whether a particular employee falls within the transportation

12  worker exemption, courts often consider whether a strike by a group of the employees at issue

13  would interrupt interstate commerce. *See, e.g.*, *Levin*, 146 F. Supp. 3d at 1155; *Vargas*, 2016 WL

14  946112, slip op. at 5. The Court finds that a strike by a large group of Plaintiffs and those

15  similarly-situated would interrupt interstate commerce. As mentioned previously, Defendants are

16  one of the country's largest businesses engaged in the interstate shipment of packages and goods.

17  A strike by Plaintiffs would be akin to local UPS or FedEx drivers striking—a strike by UPS or

18  FedEx drivers, who only personally travel intrastate, would cause a ripple effect in interstate

19  commerce because goods travelling interstate would still not make it to their final destination.

---

20  [4] Although they were decided before *Circuit City*, the postal worker cases Plaintiffs cite are also
21  helpful here. *See, e.g.*, *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988)
22  (finding that a postal worker who never personally crossed state lines still engaged in interstate
    commerce, within the meaning of Section 1, because postal workers generally are "responsible
23  for dozens, if not hundreds, of items of mail moving in interstate commerce on a daily basis").
    Defendants argue that the postal worker cases are distinguishable because postal workers are
24  members of a national collective bargaining agreement, which effectively turns intrastate postal
    workers into workers that fall within the transportation worker exemption. (Dkt. No. 108 at 11–
25  12.) This is a distinction without a difference—whether an employee signs a national collective
    bargaining agreement is irrelevant to whether they are engaged in the business of interstate
26  transportation of goods.

Therefore, Plaintiffs fall within the FAA's transportation worker exemption.

**B.      Enforceability of the Contract**

"Section 1 [of the FAA] does not, however, in any way address the enforceability of employment contracts exempt from the FAA. It simply excludes these contracts from FAA coverage entirely." *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003); *see also Palcko*, 372 F.3d at 596. Because the FAA is inapplicable to the Arbitration Provision, the Court must determine whether the Arbitration Provision is nevertheless enforceable, such that there is a valid agreement to arbitrate.

The Governing Law Provision states: "These Terms are governed by the law of the state of Washington without regard to its conflict of laws principles. However, the preceding sentence does not apply to [the Arbitration Provision], which is governed by the Federal Arbitration Act and applicable federal law." (Dkt. No. 37-1 at 5.) Having found that the FAA is inapplicable to the Arbitration Provision, the parties dispute whether it remains a valid agreement to arbitrate because the FAA's inapplicability conflicts with the language of the Governing Law Provision. (*See* Dkt. Nos. 103 at 20, 104 at 17–21, 107 at 13–14, 108 at 13–16.) "When a contract with an arbitration provision falls beyond the reach of the FAA, courts look to state law to decide whether arbitration should be compelled nonetheless." *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016). But again, the problem here is that the parties have explicitly contracted for Washington law to *not* apply to the Arbitration Provision. (Dkt. No. 37-1 at 5.)

Normally, "[t]o evaluate the validity of an arbitration agreement, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[5] Although federal and state policy favor arbitration, "courts must

---

[5] In this case, the parties have selected Washington law to govern the resolution of disputes arising out of the interpretation of the contract. (*See* Dkt. Nos. 37-1 at 5, 37-2 at 7.)

1    place arbitration agreements on an equal footing with other contracts[] and enforce them

2    according to their terms." *AT&T Mobility LLC v. Concepcion*, 565 U.S. 333, 339 (2011)

3    (citations omitted); *see also Gandee v. LDL Freedom Enters., Inc.*, 293 P.3d 1197, 1199 (Wash.

4    2013).

5         "The touchstone of contract interpretation is the parties' intent." *Pelly v. Panasyuk*, 413

6    P.3d 619, 629 (Wash. Ct. App. 2018) (quoting *Tanner Elec. Coop. v. Puget Sound Power &*

7    *Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996)). In interpreting a contract, the court must try to

8    ascertain the mutual intent of the parties at the time that they executed the contract. *Viking Bank*

9    *v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014). To determine mutual

10   intent, Washington courts follow the objective manifestation theory of contracts, meaning that

11   courts look to the reasonable meaning of the contract language instead of the subjective intent of

12   the parties. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). "If a

13   contract provision's meaning is uncertain or is subject to two or more reasonable

14   interpretations," the provision is ambiguous. *Viking Bank*, 334 P.3d at 120. Ambiguity is to be

15   construed against the drafter. *See, e.g.*, *Pierce Cty. v. State*, 185 P.3d 594, 610 (Wash. Ct. App.

16   2008).

17        Defendants argue that Washington law is clearly applicable in the event that the FAA

18   does not apply. The Court disagrees. The cases Defendants cite are inapposite; none of the cases

19   discuss a situation where the FAA is inapplicable *and the contract clearly indicates that state*

20   *law is also inapplicable*. (*See* Dkt. No. 108 at 13–17) (citing *Valdes*, 292 F. Supp. 2d at 527–30;

21   *Maldonado v. Sys. Servs. of Am., Inc.*, 2009 WL 10675793, slip op. at 1–2 (C.D. Cal. 2009*);*

22   *O'Dean v. Tropicana Cruises Int'l, Inc.*, 1999 WL 335381, slip op. at 1 (S.D.N.Y. 1999)). Here,

23   if the parties intended Washington law to apply if the FAA was found to be inapplicable, they

24   would have said so or even remained silent on the issue. Instead, they did the opposite—in the

25   Governing Law Provision, the parties explicitly indicated that Washington law is not applicable

26   to the Arbitration Provision. Indeed, it appears that it is precisely *against* the parties' intent to

apply Washington law to the Arbitration Provision. *Cf. Sagner v. Sagner*, 247 P.3d 444, 447 (Wash. Ct. App. 2011) (finding that parties are required to clearly indicate that general law is inapplicable, if that is what they intend to do). When the parties signed the contract at issue, Plaintiffs likely had no reason to believe that Washington law would ever apply to the Arbitration Provision.

Therefore, the Court finds that Washington law cannot be used to enforce the Arbitration Provision.[6] Because it is not clear what law to apply to the Arbitration Provision or whether the parties intended the Arbitration Provision to remain enforceable in the event that the FAA was found to be inapplicable, the Court finds that there is not a valid agreement to arbitrate.[7]

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration (Dkt. No. 36) is DENIED.

DATED this 23rd day of April 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[6] Because the Court finds that Washington law is inapplicable to the Arbitration Provision, it expresses no opinion as to whether the Arbitration Provision would be enforceable under Washington law.

[7] Because the Court finds that there is not a valid agreement to arbitrate, it does not address whether the agreement encompasses the dispute at issue. *See Cox*, 533 F.3d at 1119.