**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BERNADEAN RITTMANN, individually and on behalf of all others similarly situated; FREDDIE CARROLL, individually and on behalf of all others similarly situated; JULIA WEHMEYER, individually and on behalf of all others similarly situated; RAEF LAWSON, individually and on behalf of all others similarly situated; in his capacity as Private Attorney General Representative; IAIN MACK, in his capacity as Private Attorney General Representative, *Plaintiffs-Appellees*, <br><br> v. <br><br> AMAZON.COM, INC.; AMAZON LOGISTICS, INC., *Defendants-Appellants.* | No. 19-35381 <br><br> D.C. No. 2:16-cv-01554-JCC <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted February 3, 2020
Seattle, Washington

Filed August 19, 2020

2          RITTMANN V. AMAZON.COM

Before:  MILAN D. SMITH, JR., N. RANDY SMITH, and
DANIEL A. BRESS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Bress

**SUMMARY**[*]

**Arbitration**

The panel affirmed the district court's order denying the motion of Amazon.com, Inc., and Amazon Logistics, Inc., to compel arbitration of federal and state wage and hour claims brought by delivery workers.

One of the named plaintiffs agreed to Amazon's Terms of Service when he signed up to work as a delivery provider for Amazon's app-based delivery program Amazon Flex (AmFlex).  The Terms of Service included an arbitration provision.

Agreeing with the First Circuit, the panel held that AmFlex delivery workers were exempt from the Federal Arbitration Act's enforcement provisions because they were transportation workers engaged in interstate commerce under 9 U.S.C. § 1 when they made "last mile" deliveries of goods in the stream of interstate commerce.  Considering the plain meaning of the relevant statutory text, case law interpreting the exemption's scope and application, and the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

construction of similar statutory language, the panel held that to be "engaged in interstate commerce," the AmFlex workers did not themselves need to cross state lines.

The panel held that the arbitration provision, which included a choice-of-FAA clause, could not be enforced under either federal law or Washington state law.

Dissenting, Judge Bress wrote that the narrow FAA exemption for certain transportation workers did not apply. In his view, for a delivery worker to be "engaged in" interstate commerce, the worker must belong to a "class of workers" that crosses state lines in the course of making deliveries.

## COUNSEL

David B. Salmons (argued) and Michael E. Kenneally, Morgan Lewis & Bockius LLP, Washington, D.C.; Richard G. Rosenblatt, Morgan Lewis & Bockius LLP, Princeton, New Jersey; for Defendants-Appellants.

Harold Lichten (argued), Shannon Liss-Riordan, and Adelaide Pagano, Lichten & Liss-Riordan P.C., Boston, Massachusetts, for Plaintiffs-Appellees.

Toby J. Marshall, Blythe H. Chandler, and Elizabeth A. Adams, Terrell Marshall Law Group PLLC, Seattle, Washington; Jennifer D. Bennett, Public Justice, Oakland, California; for Amicus Curiae Public Justice.

Archis A. Parasharami and Daniel E. Jones, Mayer Brown LLP, Washington, D.C., for Amici Curiae Chamber of Commerce of the United States and National Association of Manufacturers.

## OPINION

M. SMITH, Circuit Judge:

Defendants Amazon.com, Inc. and Amazon Logistics, Inc. (together, Amazon) appeal the district court's order denying their motion to compel arbitration of Plaintiff Raef Lawson's federal and state wage and hour claims. Lawson is one of four named Plaintiffs in this suit. Unlike the other named Plaintiffs, Lawson agreed to all of Amazon's Terms of Service (TOS) when he signed up to work as a delivery provider for Amazon's app-based delivery program, Amazon Flex (AmFlex), including the arbitration provision at issue here.

The primary issue that we address is whether AmFlex delivery workers are exempt from the Federal Arbitration Act's (FAA), 9 U.S.C. § 1, *et seq*., enforcement provisions because they are transportation workers engaged in interstate commerce. In denying Amazon's motion to compel, the district court concluded that AmFlex delivery providers fall within the scope of the FAA's transportation worker exemption pursuant to § 1 because they deliver goods shipped from across the United States. The court further determined that the TOS bars application of Washington state law to the arbitration provision. As a result, the court concluded that there is no valid arbitration agreement between Amazon and Lawson, and denied the motion to compel. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The AmFlex Program

Plaintiffs Bernadean Rittman, Freddie Carroll, Julia Wehmeyer, and Raef Lawson contracted with Amazon

Logistics, Inc. to provide delivery services for AmFlex. Amazon Logistics, Inc. is a subsidiary of Amazon.com, Inc., an online retailer that sells its own products and provides fulfillment services for third-party sellers who also sell their products on Amazon.com.

Historically, Amazon has shipped products by using large third-party delivery providers such as FedEx and UPS. Recently, it has supplemented those delivery services by contracting with local delivery providers through its AmFlex program, which is available in certain metropolitan areas in the United States.   In the AmFlex program, Amazon contracts with individuals to make "last mile" deliveries of products from Amazon warehouses to the products' destinations using the AmFlex smart phone application. AmFlex participants use a personal vehicle or bicycle, or public transportation, to deliver products ordered through the Amazon website or mobile applications.  They pick up assigned packages from an Amazon warehouse and drive an assigned route to deliver the packages.  AmFlex delivery providers occasionally cross state lines to make deliveries, but most of their deliveries take place intrastate.  At the end of each shift, the delivery providers return undelivered packages to Amazon's warehouses.

## II.  The AmFlex Terms of Service

To sign up for the AmFlex program, individuals must agree to the AmFlex Independent Contractor TOS in the app, the most recent version of which—and the one at issue here—was updated in October 2016.  In relevant part, the TOS provides that:

> YOU  AND  AMAZON  AGREE  TO
> RESOLVE  DISPUTES  BETWEEN  YOU
> AND  AMAZON  ON  AN  INDIVIDUAL

BASIS   THROUGH   **FINAL   AND
BINDING   ARBITRATION**,   UNLESS
YOU   OPT   OUT   OF   ARBITRATION
WITHIN 14 CALENDAR DAYS OF THE
EFFECTIVE     DATE     OF     THIS
AGREEMENT, AS DESCRIBED BELOW
IN SECTION 11.  If you do not agree with
these terms, do not use the Amazon Flex app
or participate in the Program or provide any
Services.

Section 11 of the TOS in turn provides that:

b) TO THE EXTENT PERMITTED BY
LAW, THE PARTIES AGREE THAT ANY
DISPUTE RESOLUTION PROCEEDINGS
WILL BE CONDUCTED ONLY ON AN
INDIVIDUAL BASIS AND NOT ON A
CLASS OR COLLECTIVE BASIS.

The TOS is governed by "the law of the state of Washington
without regard to its conflict of laws principles, except for
Section 11 of [the] Agreement, which is governed by the
Federal Arbitration Act and applicable federal law."  The
TOS further provides that, "If any provision of this
Agreement is determined to be unenforceable, the parties
intend that this Agreement be enforced as if the
unenforceable provisions were not present and that any
partially valid and enforceable provisions be enforced to the
fullest extent permissible under applicable law."

Plaintiffs Rittmann, Carroll, and Wehmeyer timely opted
out of arbitration when they signed up for AmFlex and thus
are not subject to the arbitration provision.  Plaintiff Lawson,

however, did not opt out. He then went on to make deliveries in the Los Angeles area.

## III.    The District Court Proceedings

In 2016, Plaintiffs Rittman, Carroll, and Wehmeyer filed this proposed collective and class action lawsuit alleging that Amazon misclassifies AmFlex users as independent contractors rather than employees. In 2017, they filed a Second Amended Complaint (SAC), adding Lawson as a plaintiff. The SAC alleges violations by Amazon of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201, *et seq.*, the California Labor Code, and Washington state and Seattle municipal wage and hour laws. Plaintiffs seek to bring the FLSA claims as a nationwide collective action and their state claims as state-wide class actions.

Amazon moved to compel Lawson's claims to arbitration. The district court stayed the proceedings pending the resolution of *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), *Van Dusen v. Swift Transportation Co.*, No. 17-15102 (9th Cir. Jan. 20, 2017), and *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019). Following the Supreme Court's decision in *New Prime*, the parties supplemented their briefing on the motion to compel.

The district court denied Amazon's motion to compel. The court determined that Plaintiffs fell within the FAA's transportation worker exemption, which exempts from the FAA's arbitration enforcement provisions the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The court then considered whether the arbitration provision in Section 11 was otherwise valid and enforceable. Pointing to the text of the TOS's governing law provision, the court determined that the FAA did not govern

Section 11 in light of the application of the FAA's exemption, and that the parties did not intend Washington law to apply either. As a result, the court determined that it was not clear what law would apply to the provision, or whether the parties intended to arbitrate disputes in the event the FAA did not apply. Accordingly, the court concluded that there was no valid agreement to arbitrate and denied Amazon's motion to compel arbitration. Amazon timely appealed, and the district court stayed proceedings pending this appeal.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(B). We review an order denying a motion to compel arbitration de novo. *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018). We review the validity of an arbitration clause de novo. *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 917 (9th Cir. 2011). The factual findings underlying a district court's decision are reviewed for clear error. *Id.* The interpretation and meaning of contract provisions are questions of law that we review de novo. *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1021 (9th Cir. 2016).

## ANALYSIS

The FAA generally provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA contains a number of enforcement mechanisms for private parties to compel arbitration pursuant to a valid arbitration agreement. The FAA, however, exempts certain contracts from its scope, specifically the employment contracts of "seamen, railroad employees, [and] any other class of workers engaged in

foreign or interstate commerce." 9 U.S.C. § 1; *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118–19 (2001). This appeal requires us to decide whether the AmFlex delivery providers in this case fall within the scope of the exemption. Because we conclude that they do, and thus that their employment contracts are not subject to the FAA, we consider and reject Amazon's further argument that there is nevertheless a valid and enforceable arbitration agreement between the parties.

## I.  The FAA's Transportation Worker Exemption

Amazon challenges the district court's conclusion that AmFlex delivery providers are exempt from the FAA as transportation workers "engaged in foreign or interstate commerce." 9 U.S.C. § 1. According to Amazon, its delivery providers participate in "purely intrastate *activities*" when they make last mile deliveries and thus are not "engaged in interstate *commerce*." Amazon's position rests on the notion that transportation workers must actually cross state lines to be "engaged in interstate commerce" for the exemption to apply. We reject that construction of that statute. Properly construed, § 1 encompasses the contracts of the AmFlex delivery providers in this case.

### A. The Meaning of "Engaged in Interstate Commerce" in § 1

To resolve Amazon's appeal, we must first interpret the meaning of the phrase "engaged in interstate or foreign commerce," as used in § 1 of the FAA. We begin by briefly turning to the Supreme Court's decision in *Circuit City*, in which the Court addressed the scope and application of § 1. The Court held that § 1 narrowly "exempts from the FAA only contracts of employment of transportation workers," and not all contracts of employment generally. *Id.* at 119;

*see also id.* at 118 ("[T]he location of the phrase 'any other class of workers engaged in . . . commerce' in a residual provision, after specific categories of workers have been enumerated, undermines any attempt to give the provision a sweeping, open-ended construction."). To arrive at that conclusion, the Court interpreted "[t]he plain meaning of the words 'engaged in commerce' [to be] narrower than the more open-ended formulation 'affecting commerce' and 'involving commerce'" when construed "with reference to the statutory context . . . and in a manner consistent with the FAA's purpose." *Id.* at 118. In limiting the exemption's scope to employment contracts of transportation workers, the Court did not decide the specific issue that Amazon raises: whether transportation workers must cross state lines to be considered workers "engaged in commerce" for the purposes of the exemption's application.

We do not, however, approach this issue on a blank slate. The plain meaning of the relevant statutory text, case law interpreting the exemption's scope and application, and the construction of similar statutory language all support the conclusion that transportation workers need not cross state lines to be considered "engaged in foreign or interstate commerce" pursuant to § 1.

To ascertain the plain meaning of the statutory text, we look to the "ordinary meaning at the time Congress enacted the statute." *New Prime*, 139 S. Ct. at 539 (alterations adopted) (internal quotation marks omitted) (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). When Congress enacted the FAA, the word "engaged" meant "occupied or employed." *Engaged*, Webster's New International Dictionary (1st ed. 1909). "Commerce" was defined as:

> Intercourse by way of trade and traffic between different people or states and the citizens or inhabitants thereof, including not only the purchase, sale, and exchange of commodities, but also the instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on, and the transportation of persons as well as of goods, both by land and by sea.

*Commerce*, Black's Law Dictionary (2d ed. 1910). Taken together, those definitions can reasonably be read to include workers employed to transport goods that are shipped across state lines. The ordinary meaning of those words does not suggest that a worker employed to deliver goods that originate out-of-state to an in-state destination is not "engaged in commerce" any less than a worker tasked with delivering goods between states.

Our reading of the statutory text is reinforced by decisions of other circuits and our own that have applied the exemption, as well as decisions that interpret similar statutory language. Most recently, in a nearly identical case involving the AmFlex program, the First Circuit held that AmFlex delivery providers fall within the § 1 exemption. *Waithaka v. Amazon.com, Inc.*, No. 19-1848, — F.3d —, 2020 WL 4034997, at *1 (1st Cir. July 17, 2020). Relying on much of the same reasoning discussed below, *see infra* pp. 15–21, the First Circuit looked to statutes contemporaneous to the FAA, in particular the Federal Employees Liability Act (FELA) of 1908, to conclude that the meaning of the phrase "engaged in interstate commerce," as understood at the time of the FAA's passage, was not limited to those transportation workers who themselves crossed state lines. *Waithaka*, 2020 WL 4034997, at *5–8.

Further, at the time the Supreme Court decided *Circuit City*, every other circuit to have addressed the issue presented here interpreted § 1 to exempt "the employment contracts of workers actually *engaged in the movement of goods in interstate commerce*." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (emphasis added) (collecting cases). Courts did not interpret that definition to require that a worker actually cross state lines for purposes of the exemption. For example, in *Palcko v. Airborne Express, Inc.*, the Third Circuit held that a supervisor for a package transportation and delivery company who supervised drivers delivering packages in the Philadelphia area was a transportation worker engaged in interstate commerce because her work was "so closely related [to interstate and foreign commerce] as to be in practical effect part of it."[1] 372 F.3d 588, 593 (3d Cir. 2004) (alterations in original) (quoting *Tenney Eng'g, Inc. v. United Elec. & Mach. Workers of Am.*, 207 F.2d 450, 452 (3d Cir. 1953)).

Federal district courts and state courts have also understood § 1 not to require that a worker cross state lines. *See, e.g.*, *Nieto v. Fresno Beverage Co., Inc.*, 245 Cal. Rptr. 3d 69, 76 (Ct. App. 2019) (stating that a beverage company's deliveries of products purchased from national and international companies, "although intrastate, were

---

[1] Recently, the Third Circuit affirmed *Palcko* and expanded its test to include workers who transport people, like rideshare services. *Singh v. Uber Techs., Inc.*, 939 F.3d 210, 219 (3d Cir. 2019). "[T]he residual clause of § 1 is not limited to transportation workers who transport goods, but may also apply to those who transport passengers, so long as they are engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it." *Id.* The court remanded to the district court to decide whether rideshare drivers are engaged in interstate transportation within the meaning of § 1. *Id.* at 227.

essentially the last phase of a continuous journey of the interstate commerce . . . being transported until reaching its destination[] to [the company's] customers."); *Christie v. Loomis Armored US, Inc.*, No. 10-cv-02011-WJM-KMT, 2011 WL 6152979, at *3 (D. Colo. Dec. 9, 2011) (finding intrastate delivery driver of currency exempt because the deliveries involved "a good that is undisputedly in the stream of interstate commerce"); *Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079, 1085–87 (D. Colo. 2019); *Zamora v. Swift Transp. Corp.*, No. EP-07-CA-00400-KC, 2008 WL 2369769, at *9 (W.D. Tex. June 3, 2008), *aff'd on other grounds*, 319 F. App'x 333 (5th Cir. 2009).

Courts have determined that workers do not fall within the scope of § 1's exemption when their job duties are "only tangentially related to [the] movement of goods." *Lenz v. Yellow Transp., Inc*., 431 F.3d 348, 351–52 (8th Cir. 2005). For example, in *Lenz*, the court held a customer service representative for a transportation carrier was not engaged in interstate commerce because he "never directly transported goods in interstate commerce," "had no direct responsibility for transporting goods in interstate commerce," "never handled any of the packages that [the carrier] delivered," or "directly supervise[d] the drivers in interstate commerce," among other reasons. *Id.* at 352–53. Similarly, the Eleventh Circuit concluded that "workers who incidentally transported goods interstate as a part of their job in an industry that would otherwise be unregulated" did not fall within the exemption. *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005) (holding that an account manager for a rent-to-own business who occasionally made out-of-state deliveries was not part of a class of workers in the transportation industry for purposes of the § 1 exemption).

Case law interpreting the phrase "engaged in commerce" in § 1 accords with how courts have interpreted similar statutory language.  For example, courts interpreting FELA have held that workers were employed in interstate commerce even when they did not cross state lines.

FELA provides that "[e]very common carrier by railroad while *engaging in commerce between any of the several States* . . . shall be liable in damages to any person suffering injury while he is *employed by such carrier in such commerce*" if the injury "results in whole or in part from the negligence of" the carrier.  45 U.S.C. § 51 (emphasis added). Prior to the FAA's enactment in 1925, the Supreme Court articulated that "the true test of such employment in [such] commerce in the sense intended is, [w]as the employee, at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?"  *Shanks v. Del., Lackwanna & W. R.R. Co.*, 239 U.S. 556, 558 (1916).  The Court cited numerous examples of injured employees considered to be engaged in interstate commerce when they did not cross state lines in the course of their work.[2]  *Id.* at 558–59 (collecting cases).  *See also*

---

[2] Amazon attempts to distinguish cases that interpret FELA on the basis that FELA "require[s] a broad construction directly opposite to the narrow construction that the Exemption requires given the FAA's purposes."  But FELA's breadth concerns what conduct constitutes an employer's *negligence* within the meaning of the act, not the meaning of "employed in commerce" that concerns us here.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561 (1987) ("A primary purpose of the Act was to eliminate a number of traditional defenses to tort liability and to facilitate recovery in meritorious cases."); *id.* at 562 n.8 ("Indeed, in the spirit of broad construction, the FELA has been construed to cover some intentional torts even though its text only mentions negligence."); *Jamison v. Encarnacion*, 281 U.S. 635, 640 (1930), *superseded by statute on other grounds as recognized in McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991) ("The Act

*Phila. & R. Ry. Co. v. Hancock*, 253 U.S. 284, 286 (1920) (railroad worker injured while operating a train carrying coal, some of which would ultimately be shipped out of state, was engaged in interstate commerce for FELA purposes because "the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state"); *Waithaka*, 2020 WL 4034997, at *5 ("[W]orkers 'engaged in interstate commerce' did not refer only to those workers

is not to be narrowed by refined reasoning or for the sake of giving 'negligence' a technically restricted meaning.  It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word ['negligence'] may be read to include all the meanings given to it by courts, and within the word as ordinarily used.").  Moreover, contrary to the dissent's position, "there is no indication that the remedial purpose of the FELA affected the Supreme Court's conclusion that injured railroad workers who were transporting within one state goods destined for or coming from other states . . . were engaged in interstate commerce."  *Waithaka*, 2020 WL 4034997, at *8.  As the First Circuit explained, "FELA was concerned with the activities of employees, just as the FAA is.  Indeed, in . . . the FELA precedents that we have discussed, the question before the Court was the same as it is here: whether certain transportation workers engaged in interstate commerce."  *Id.* at *7.

Amazon also points out that Congress amended FELA to eliminate courts' line-drawing between intrastate and interstate activities.  The 1939 amendment added a paragraph that broadened FELA's application beyond those "employed in commerce" to include "[a]ny employee of a carrier, any part of whose duties . . . shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered entitled to the benefits of this chapter."  45 U.S.C. § 51.  Whatever the "very fine distinctions" drawn in cases interpreting FELA before 1939, *see S. Pac. Co. v. Gileo*, 351 U.S. 493, 497 (1956), there is no question that the "employed in commerce" language embraced employees who did not cross state lines but were nevertheless engaged in interstate commerce.

who themselves carried goods across state lines, but also included at least two other categories of people: (1) those who transported goods or passengers that were moving interstate," and "(2) those who were not involved in transport themselves but were in positions 'so closely related' to interstate transportation 'as to practically be a part of it" (citations omitted).).  "In incorporating almost exactly the same phraseology into the Arbitration Act of 1925 its draftsmen and the Congress which enacted it must have had in mind this current construction of the language which they used."  *Tenney*, 207 F.2d at 453.

Similarly, the Supreme Court has held that the actual crossing of state lines is not necessary to be "engaged in commerce" for purposes of the Clayton and Robinson-Patman Acts.  In a pair of cases decided in the same term, the Court clarified that Congress's use of the term "engaged in commerce" was a limited assertion of its jurisdiction, and "denote[d] only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer."  *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974).  Put another way, "[t]o be engaged 'in commerce' within the meaning of [the Clayton Act], a corporation must itself be directly engaged in the production, distribution or acquisition of goods or services in interstate commerce."  *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 283 (1975) (holding that the phrase "'engaged in commerce' as used in § 7 of the Clayton Act means engaged in the flow of interstate commerce").  Thus, "a firm engaged in entirely intrastate sales of asphaltic concrete, a product that can be marketed only locally," even though the product was used to surface roads and interstate highways, was not "engaged in commerce" when it did not make interstate sales and was not

otherwise involved in national markets. *Gulf Oil*, 419 U.S. at 188, 195. The Court suggested that the firm could have satisfied the interstate commerce hook by showing that "the local market in asphaltic concrete [was] an integral part of the interstate market in other component commodities or products." *Id.* at 196.[3]

Although "statutory jurisdictional formulations" do not "necessarily have a uniform meaning whenever used by Congress," *Circuit City*, 532 U.S. at 118 (quoting *Am. Bldg.*, 422 U.S. at 277), the fact that the phrases "employed in commerce" or "engaged in commerce" have not been interpreted to require businesses or employees to cross state lines persuades us that Amazon's unduly restrictive construction of the phrase is unwarranted. *See Swift & Co. v. United States*, 196 U.S. 375, 398–99 (1905) ("[C]ommerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.").

Amazon insists that the term "engaged in commerce," as used in those statutes and as discussed in *Circuit City*, is not akin to the phrase "engaged in *foreign or interstate*

---

[3] Amazon's further concern that these statutes encompass broader conduct than § 1 does not relate to the interpretation of the term "engaged in commerce," but instead pertains to the subject that phrase modifies in those particular statutes. For example, citing *American Building*, 422 U.S. at 283, Amazon claims that "[i]n cases applying other statutes, courts have included much more than transportation in the 'flow' of commerce, including the *production* of goods for interstate sales." That case involved the Clayton Act, which made it unlawful "*for any person* engaged in commerce" to discriminate in price. *See Gulf Oil*, 419 U.S. at 193 n.9 (emphasis added). Here, however, the concern that § 1 may sweep so broadly as to apply to corporations that manufacture or produce goods in interstate commerce is unfounded, because § 1 applies only to *transportation workers* engaged in such commerce.

commerce" in § 1 of the FAA. Amazon argues that we must interpret the latter phrase in § 1 so as not to read words out of the statute. *See Circuit City,* 532 U.S. at 117 (discussing *Gulf Oil*, 419 U.S. at 202, and *Am. Bldg.*, 422 U.S. at 283). That contention is not persuasive.

The term "in commerce" refers to interstate and foreign commerce—the type of commerce that Congress has the power to regulate. *See, e.g.*, *Gulf Oil*, 419 U.S. at 195 ("[T]he distinct 'in commerce' language of the Clayton and Robinson-Patman Act provisions . . . appears to denote only persons or activities within the flow of *interstate* commerce." (emphasis added)); *Am. Bldg.*, 422 U.S. at 285–86 ("[S]ince the Benton companies did not participate directly in the sale, purchase, or distribution of goods or services *in interstate commerce*, they were not 'engaged in commerce' within the meaning of § 7 of the Clayton Act.") (emphasis added)). The FAA defines the term "commerce" as "commerce among the several States or with foreign nations . . ." 9 U.S.C. § 1. We see no way to meaningfully distinguish between the word "commerce" used in § 2, defined as "commerce among the several States or with foreign nations," with the "foreign or interstate commerce" referenced in § 1. As *Circuit City* explains, Congress did not vary *what* it regulated in these provisions, only the reach of its regulation. *Circuit City*, 532 U.S. at 115, 117–18 (explaining that the phrase "affecting" or "involving" commerce demonstrated an intent to regulate to the full extent of Congress's Commerce Clause authority, whereas "engaged in commerce" is "understood to have a more limited reach"). Indeed, interpreting § 1, the Supreme Court itself used the phrase "engaged in commerce" as shorthand for the statutory text "engaged in foreign or interstate commerce." *See Circuit City*, 532 U.S. at 115, 116, 118.

Amazon and the dissent further contend that we must narrow the definition of "engaged in foreign or interstate commerce" to accord with the FAA's statutory context and pro-arbitration purposes. We recognize that *Circuit City* rejected an expansive reading of the transportation worker exemption based in part on construing the statutory phrase "engaged in commerce" more narrowly than the phrase "involving commerce" in § 2. But *Circuit City* interpreted the phrase in that manner to explain why the exemption applied only to the employment contracts of transportation workers, as opposed to all employment contracts. *See* 532 U.S. at 118–19. Nothing in *Circuit City* requires that we rely on the pro-arbitration purpose reflected in § 2 to even *further* limit the already narrow definition of the phrase "engaged in commerce." The authorities we have discussed simply do not run afoul of *Circuit City* because, as we have explained, *Circuit City* did not address what is at issue here.[4]

In light of the weight of authority interpreting "engaged in commerce" not strictly to require the crossing of state lines, we are not persuaded that § 1 is amenable to the interpretation offered by Amazon. Accordingly, we

---

[4] Amazon also relies on *Circuity City*'s discussion of existing and forthcoming legislation around the time the FAA was passed that provided for arbitration of disputes for transportation workers to argue that Congress did not intend the § 1 exemption to encompass the type of delivery providers at issue here. *See Circuit City*, 532 U.S. at 120–21. For the reasons the Third Circuit persuasively articulated in *Singh*, 939 F.3d at 225, we refuse to rely on speculation in *Circuit City* as to Congress's intent—not only because doing so would be imprudent, but also because the Supreme Court cautioned against it. *See Circuit City*, 532 U.S. at 119–20. *See also Waithaka*, 2020 WL 4034997, at *10 ("[T]he residual clause means that Congress contemplated the future exclusion of workers other than railroad employees and seamen, and it did not limit that exclusion to those with available dispute resolution systems. Purpose cannot override text.").

conclude that § 1 exempts transportation workers who are engaged in the movement of goods in interstate commerce, even if they do not cross state lines.

## B. Application of § 1 to AmFlex Delivery Providers

In light of our construction of the statute and consideration of the record, we conclude that AmFlex delivery providers belong to a class of workers engaged in interstate commerce that falls within § 1's exemption.

Amazon is "one of the world's largest online retailers" that "work[s] closely with freight and transport companies on a massive scale to ensure that every individual shipment gets where it needs to go." Amazon Logistics, with an aim to "expand transportation capabilities worldwide," seeks to achieve its goal of "provid[ing] customers with an incredible package delivery experience through the last mile of the order" by partnering with independent delivery businesses and AmFlex delivery providers. AmFlex delivery providers are a class of workers that transport packages through to the conclusion of their journeys in interstate and foreign commerce.

There is no suggestion that the goods AmFlex workers deliver originate in the same state where deliveries take place, such that delivery providers are making purely intrastate deliveries. Rather, AmFlex workers pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination. Although Amazon contends that AmFlex delivery providers are "engaged in local, intrastate activities," the Amazon packages they carry are goods that remain in the stream of interstate commerce until they are delivered. AmFlex delivery providers are thus transportation workers engaged in the movement of

interstate commerce and exempt from the FAA's application.

The cases on which Amazon relies do not persuade us otherwise. In *People of State of New York ex rel. Pennsylvania Railroad Co. v. Knight*, 192 U.S. 21 (1904), the Supreme Court held that an interstate railroad that charged separately for a wholly intrastate cab service that transported railroad passengers to and from the ferry was subject to state taxation because the cab service was "exclusively rendered within the limits of the city" and "contracted and paid for independently of any contract or payment for strictly interstate transportation." *Id.* at 26.

Amazon contends that the "separation in fact . . . between transportation service wholly within the state and that between the states," *id.* at 27, is relevant here, where Amazon contracts for local deliveries with AmFlex drivers. While that fact may be relevant for taxation purposes, the Court explained that, "[u]ndoubtedly, a single act of carriage or transportation wholly within a state may be part of a continuous interstate carriage or transportation. Goods shipped from Albany to Philadelphia may be carried by the New York Central Railroad only within the limits of New York, and yet that service is in interstate carriage." *Id.* at 26. That is precisely the case here. AmFlex drivers' transportation of goods wholly within a state are still a part of a continuous interstate transportation, and those drivers are engaged in interstate commerce for § 1's purposes.

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) is similarly distinguishable. In *Schechter Poultry*, live poultry shipped from out of state "came to rest" when they reached slaughterhouses for "slaughter and local sale to retail dealers and butchers who in turn sold directly to consumers." *Id.* at 543. "The

interstate transactions in relation to that poultry" thus ended at the slaughterhouse: "So far as the poultry here in question is concerned, the flow in interstate commerce had ceased. The poultry had come to a permanent rest within the state. It was not held, used, or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states." *Id.* at 542–43. Once the poultry reached the slaughterhouses, any further "commerce" involving the poultry required new or subsequent transactions, all of which took place within the state of the slaughterhouse. Those transactions thus marked the dividing line between interstate and intrastate commerce. *Id.*

Here, however, Amazon packages do not "come to rest," at Amazon warehouses, and thus the interstate transactions do not conclude at those warehouses. The packages are not held at warehouses for later sales to local retailers; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys. The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus AmFlex drivers are engaged in the movement of interstate commerce.[5]

We agree with the district court that cases involving food delivery services like Postmates or Doordash are likewise distinguishable. Those cases recognize that local food delivery drivers are not "engaged in the interstate transport

---

[5] We do not purport, as the dissent contends, to create a "come to rest" doctrine. Amazon's reliance on *Knight* and *Schecter Poultry* is misplaced, and, as we explain, those cases are readily distinguishable from the facts at hand.

of goods" because the prepared meals from local restaurants are not a type of good that are "indisputably part of the stream of commerce." *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1153 (N.D. Cal. 2015) (internal quotation marks omitted); *accord Lee v. Postmates Inc.*, 2018 WL 6605659, at *7 (N.D. Cal. Dec. 17, 2018) (concluding that deliveries for local merchants by a company that does not hold itself out as transporting goods between states are not engaged in interstate commerce). The Seventh Circuit's decision in *Wallace v. Grubhub Holdings, Inc.*, — F.3d —, 2020 WL 4463062 (7th Cir. 2020) is, as well. In *Wallace*, the court held that Grubhub drivers, who deliver take-out orders from local restaurants, are not covered by the § 1 exemption. *Id.* at *3. The court determined that the focus of the § 1 inquiry is "on the worker's active engagement in the enterprise of moving goods across interstate lines." *Id.* at *2 (citing *Waithaka*, 2020 WL 4034997, at *11, for the proposition that "truckers who drive an intrastate leg of an interstate route" fall within the exemption). "Put differently, a class of workers must themselves be 'engaged *in the channels* of foreign or interstate commerce."[6] *Id.* at *3 (quoting *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998)). Unlike in *Wallace*, here AmFlex workers complete the delivery of goods that Amazon ships across state lines and for which Amazon hires AmFlex workers to complete the delivery. AmFlex workers form a part of the channels of

---

[6] Despite the dissent's reliance on *Wallace*, the Seventh Circuit did not adopt the dissent's proposed interpretation, that workers must actually cross state lines to be considered "engaged in interstate commerce" for purposes of § 1.

interstate commerce, and are thus engaged in interstate commerce as we understand that term.[7]

Our dissenting colleague rejects these distinctions, insisting that all local delivery is the same, regardless of what is being delivered or from where. The dissent contends that "AmFlex workers' 'engagement' as workers delivering goods from out of state loses sight of the fact that the out-of-state nature of the goods is irrelevant to the actual work the AmFlex workers perform." As we have explained, the dissent's characterization ignores Supreme Court precedent interpreting nearly identical language that does, in fact, consider the out-of-state nature of goods. *See, e.g.*, *Hancock*, 253 U.S. at 286 (rejecting the argument that coal transported by railroad was not part of interstate commerce in its preliminary intrastate journey and concluding that "[t]he determining circumstance is that the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state").

In addition, the dissent's preference to define AmFlex delivery providers as a class of workers engaged in purely local deliveries turns on the contention that the exemption's "coverage does not depend on the company for whom the

---

[7] Setting aside whatever merits of the dissent's discussion of jarred sauces and canned sodas, the fact remains that AmFlex workers are engaged to deliver packages from out of state or out of the country, even if they also deliver food from local restaurants. They are thus engaged in interstate commerce, even if that engagement also involves intrastate activities. *See Harden v. Roadway Package Sys., Inc.*, 249 F.3d 1137, 1140 (9th Cir. 2001) (delivery driver who "*contracted* to deliver packages throughout the United States" (emphasis added) was engaged in interstate commerce for purposes of § 1, even where there was no indication the driver himself actually crossed state lines).

delivery person works."   We are persuaded by the First Circuit's reasoning, which squarely rejected this argument:

> Although our ultimate inquiry is whether a class of workers is "engaged in . . . interstate commerce," the question remains how we make that determination.  The nature of the business for which a class of workers perform their activities must inform that assessment.  After all, workers' activities are not pursued for their own sake.  Rather, they carry out the objectives of a business, which may or may not involve the movement of "persons or activities within the flow of interstate commerce."

*Waithaka*, 2020 WL 4034997, at *8.  Although the dissent contends that the nature of a business is not tethered to the text of the residual clause, the residual clause does not foreclose such a consideration.  Indeed, "[c]onsideration of the nature of the hiring company's business carries out the Supreme Court's instruction that we must construe the residual clause of Section 1 consistently with the specific preceding categories of workers—'seamen' and 'railroad employees'."  *Id.* (citation omitted).  "Plainly, these groups, defined by the nature of the business for which they work, demonstrate that the activities of a company are relevant in determining the applicability of the FAA exemption to other classes of workers."  *Id.*

In this case, Amazon's business includes not just the selling of goods, but also the delivery of those goods, typically undertaken by those businesses we have considered to be engaged in foreign and interstate commerce, e.g., FedEx and UPS.  *See Harden*, 249 F.3d at 1140  (holding

delivery driver for predecessor company of FedEx fell within the § 1 exemption).[8]  Were Amazon to use a proprietary ship fleet or rail system to accomplish the same goals, those workers would be subject to the exemption. Contrary to the dissent's understanding, the "limiting" factors we rely on today stem directly from the statute and do not run afoul of the canon of *ejusdem generis*.

The dissent also contends that Amazon's reading of the statute is more beneficial because "it is relatively easy to

---

[8]  The dissent places great weight on *Harden*, focusing on the "plainly interstate nature of the delivery work" in that case.  But there is no indication that the delivery driver in that case actually crossed state lines, as the dissent here contends is necessary to be engaged in interstate commerce.  Rather, we concluded in *Harden* that delivery drivers were engaged in interstate commerce for purposes of § 1 where they *contracted* to "provid[e] a small package information, transportation and delivery service throughout the United States, with connecting international service."  *Harden*, 249 F.3d at 1139.  In that case, we focused not on the precise movements of specific workers—as our decision did not turn on the driver's specific routes and whether they were interstate but on the fact that the worker had been engaged to move packages "throughout the United States, with connecting international service."  *Id.* at 1140.  Indeed, in *Harden*, we did not distinguish between long-haul transportation or local deliveries, despite the dissent's insistence that the FAA requires as much.  Nothing in that decision supports the dissent's assumption that the delivery driver himself made deliveries "throughout the United States."  That's not how companies like UPS or FedEx, the successor to the company in *Harden*, work.  Just like Amazon, those companies generally use long-haul truckers to transport goods across state lines to distribution warehouses, where intrastate delivery drivers pick up packages to make last-mile deliveries from those warehouses to the packages' final destinations.  Without more detail about the type of work the plaintiff in *Harden* engaged in, the more plausible inference is that the driver there, specifically a delivery driver, made last-mile deliveries wholly within a given state, as opposed to piloting cargo planes to provide "connecting international service" or providing other interstate "information [or] transportation" services.  *Id.*

apply," as opposed to its view that we undertake impermissible "line-drawing" not supported by the statute. However, as the First Circuit explained, line-drawing "is a product of *Circuit City* itself. In concluding that the residual clause does not encompass all employment contracts, but only those of transportation workers, the Court left it to the lower courts to assess which workers fall within that category. Doing so unavoidably requires the line-drawing that courts often do." *Waithaka*, 2020 WL 4034997, at *11. The same is true with respect to determining whether a class of workers is engaged in interstate commerce. If that line-drawing proves to be unmanageable, it is up to Congress, not jurists, to revise the statute. Congress did so with FELA, *see supra* note 2, and we have no reason to believe it cannot do so here. Contrary to the dissent's position, we do not interpret the FAA based on aspiration, but rather according to the meaning of the statute's words at the time the FAA was enacted.[9] *New Prime*, 139 S. Ct. at 539.

Accordingly, we conclude that AmFlex delivery providers fall within the exemption, even if they do not cross state lines to make their deliveries. The district court did not err in denying Amazon's motion to compel arbitration on that basis.

---

[9] Notably, the only contemporaneous support for the dissent's preferred interpretation comes from the same dictionaries we use to ascertain the FAA's meaning at is enactment. For all its critiques of FELA, the dissent ignores the longstanding reliance on that statute to interpret the FAA's text, dating back to the 1950s, *see Tenney*, 207 F.2d at 453; *Waithaka*, 2020 WL 4034997, at *6, and offers no other authority from the relevant time period to support its position.

## II. There is No Valid and Enforceable Arbitration Agreement

Although we have concluded that the AmFlex workers are exempt from the FAA's coverage provisions, Amazon argues that we may nevertheless enforce the arbitration provision pursuant to federal law and Washington state law. We disagree.

### A.  Federal Law

Amazon argues that we must nevertheless enforce the arbitration provision in accordance with federal law pursuant to the TOS's choice of law provision.   According to Amazon, the parties did not negotiate for the FAA to apply only to make the FAA inapplicable, such that "[f]or the parties' choice-of-FAA provision to have any meaning, it must mean more than that the FAA governs to the extent it governs of its own force."   That circular argument fails. Because we must give effect to the parties' contract as written, the FAA does not apply because the arbitration provision is still subject to the transportation worker exemption in § 1.

Amazon does not identify what other "applicable federal law" would govern the arbitration provision, apart from the FAA.  It argues that "the FAA's enforcement provisions are a body of 'substantive law'" that the parties are free to agree to apply, just as they could "agree to apply the substantive contract law of a particular state that would not apply by its own force."

Unlike this case, the cases Amazon cites involve arbitration agreements to which the FAA applies.  *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("The effect of [§ 2 of the FAA] is

to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement *within the coverage of the Act*." (emphasis added)).  Those cases discuss the applicability of the FAA's substantive law in federal diversity cases and in state court cases where courts would typically apply state substantive law, concluding that, consistent with the FAA's pro-arbitration goals of overcoming judicial hostility to arbitration, the FAA preempts state anti-arbitration statutes.  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271 (1995); *Southland Corp. v. Keating*, 465 U.S. 1, 10, 13–14 (1984) (concluding that the FAA preempts state laws that "require a judicial forum for the resolution of claims which the parties agreed to resolve by arbitration"); *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) (concluding that the contracting parties are free to agree "to abide by state rules of arbitration," and "enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA").  They do not support Amazon's argument that parties may contract around the FAA's transportation worker exemption.  Accordingly, we cannot conclude that any federal law governs the TOS's arbitration provision.

### B.  Washington State Law

Amazon next asserts that, in the event the FAA and federal law do not apply, Washington state law governs the arbitration provision pursuant to the TOS's severability provision or by applying choice-of-law principles.  We disagree.

The TOS provides that: "These Terms are governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration

Act and applicable federal law." Amazon contends that the district court should have severed the choice-of-FAA provision pursuant to this provision and, thus, Washington law would apply to the TOS in its entirety.

Two principles of contract interpretation under Washington law foreclose Amazon's desired result. Pursuant to Washington law, a court gives effect to a severability clause if the court "can easily excise the unconscionable provision without essentially rewriting the contract." *McKee v. AT&T Corp.*, 191 P.3d 845, 861 (Wash. 2008) (en banc). Washington law also follows the contract law principle that "any ambiguity in a contract will be construed against the drafter." *Dennis v. Great Am. Ins. Co.*, 503 P.2d 1114, 1117 (Wash. App. 1972). Applying those principles here leads us to reject Amazon's arguments.

Even if we assume *arguendo* that the provision is susceptible to a severability analysis,[10] it does not help Amazon. Were we to sever the choice-of-FAA clause, the governing law provision would state that the TOS is "governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement." In that case, the plain language of the contract would prohibit applying Washington law to the arbitration provision.

To escape that result, Amazon would have us go further and sever the entire "except for" clause. In light of the fact that the provision expressly treats the arbitration provision differently, that approach would violate the principle that we

---

[10] We fail to see how the choice-of-FAA clause that Amazon drafted is unconscionable merely because the provision does not work as Amazon might have intended.

are not free to rewrite the contract under the guise of severability. Lawson further argues that Amazon's approach runs the risk of reforming the contract if the parties did not intend that Washington law apply to the arbitration provision under any circumstances. We need not reach that question. Because it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result.[11]

Amazon's choice-of-law arguments likewise fail. Amazon argues that Washington law presumptively governs in the absence of a conflict of law. Washington law recognizes that "[w]here laws or interests of concerned states do not conflict, the situation presents a false conflict and the presumptive local law [applies]." *Shanghai Commercial Bank Ltd. v. Kung Da Chang*, 404 P.3d 62, 65 (Wash. 2017) (internal quotation marks omitted). Even if we assume that this principle applies, we do not see what it proves. As we have explained, we cannot sever the clause that applies Washington law to the contract "except for Section 11" from the governing law provision without impermissibly rewriting the contract. Amazon cites no authority that would allow us to conclude that the presumption in favor of local law overcomes express contractual language that precludes its application.

Because there is no law that governs the arbitration provision, we agree with the district court that there is no

---

[11] We recognize that the First Circuit's decision in *Waithaka* reached a different result in interpreting identical contract terms. However, it is not clear that the court applied the Washington state law principles of contract interpretation that we identify here. *See Waithaka*, 2020 WL 4034997, at *12 & n.13. Applying those principles, we are not persuaded by Amazon's severability arguments.

valid arbitration agreement. We therefore reject Amazon's alternative bases to compel arbitration.

## CONCLUSION

We hold that the AmFlex delivery providers in this case are transportation workers engaged in interstate commerce and are thus exempt from the FAA's enforcement provisions pursuant to § 1. We further hold that the parties did not enter into a valid agreement to arbitrate and that there is no other ground upon which we may enforce the arbitration provision. We therefore affirm the district court's denial of Amazon's motion to compel arbitration.

**AFFIRMED.**

BRESS, Circuit Judge, dissenting:

The Federal Arbitration Act (FAA) broadly allows agreements to arbitrate, but contains a narrow exemption for certain transportation workers: "[N]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Like "seamen" and "railroad employees," are Amazon AmFlex workers who deliver packages, groceries, and restaurant food locally and intrastate using their cars, bicycles, and public transportation a "class of workers engaged in foreign or interstate commerce"? The question is a reasonably close one that is made difficult by the need to apply somewhat opaque, century-old statutory language to a technology-based convenience of modern life. But on the metrics that matter—statutory text, precedent, and the workability of the competing regimes under the FAA's contemplated

objectives—I think Amazon has the better of the argument, in some instances by a leg and in others by a length.

In my view, for a delivery worker to be "engaged in" interstate commerce under the FAA, he must belong to a "class of workers" that crosses state lines in the course of making deliveries. The majority's contrary reading is less supported in the statutory text and invites difficult line-drawing problems. Seeking to resist the logical implication of its holding—under which the FAA's narrow transportation worker exemption could broadly include anyone who delivers goods between any two locations—the majority constructs a new FAA doctrine under which the exemption turns on the supposed "continuity" of the interstate commerce and where items "come to rest." Concepts such as these proved highly vexing in the Commerce Clause context when tried over a hundred years ago. I am concerned they will fare no better here, leading to perplexing and costly factual inquiries that in turn create uncertainty as to whether a dispute is arbitrable. That is contrary to the FAA's objective that the intended efficiencies of arbitration should not be overwhelmed by the inefficiency of litigation over whether a dispute is arbitrable.

I respectfully dissent because I would have held that the district court erred in denying Amazon's motion to compel arbitration.

I

A

It is helpful to begin by considering the § 1 exemption for transportation workers in the context of the FAA as a whole. Enacted in 1925, the FAA "seeks broadly to overcome judicial hostility to arbitration agreements."

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995)).  Section 2 is the "primary substantive provision" of the Act.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  Section 2 provides in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  This provision "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24).  Section 1 creates a limited exemption to § 2.  Under § 1, the FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

The Supreme Court's decision in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), addressed the relationship between these two provisions.  In *Circuit City*, our court had held that § 1 exempted from the FAA "all contracts of employment." *Id.* at 109.  The Supreme Court disagreed, holding that § 1 "exempts from the FAA only contracts of employment of transportation workers." *Id.* at 119.  I will discuss *Circuit City*'s specific reasoning as I work through my analysis.  But the point to emphasize up front is that

based on the FAA's "plain meaning" and historical considerations, the Supreme Court in *Circuit City* confirmed what the language and structure of the FAA connotes, namely, that § 2 must be given an "expansive reading," whereas the § 1 transportation worker exemption should "be afforded a narrow construction" and a "precise reading." *Id.* at 113, 118–19.

Raef Lawson, the named plaintiff at issue here, signed up to work as a local delivery provider for Amazon through the Amazon Flex (AmFlex) app. AmFlex operates in select cities in the United States. AmFlex workers deliver items for Amazon and local merchants using their personal vehicles, bicycles, or public transportation. Lawson's agreement with Amazon contained an arbitration clause. Lawson could have opted out of arbitration by sending an email to Amazon, as other AmFlex workers did. But Lawson did not do this. Instead, he now argues he may bring his wage-related claims against Amazon in court on the theory that he is exempt from the FAA altogether under § 1.

The majority asserts in passing that "AmFlex delivery providers occasionally cross state lines to make deliveries." Maj. Op. 6. But the majority opinion does not turn on this. And the record contains only one example of such interstate delivery work, consisting of a single AmFlex delivery provider who worked in the "New York City area" and once delivered a package from Brooklyn to New Jersey. Plaintiffs do not allege that either Lawson or the typical AmFlex delivery provider crosses state lines when making deliveries. As a "class of workers," AmFlex providers thus do not move between States in the course of their duties.

Instead, the majority holds that AmFlex workers like Lawson are exempt from the FAA because "§ 1 exempts transportation workers who are engaged in the movement of

goods in interstate commerce, even if they do not cross state lines." Maj. Op. 20–21. In the majority's view, AmFlex workers fall within the § 1 exemption because "the Amazon packages they carry are goods that remain in the stream of interstate commerce until they are delivered." *Id.* at 21. Because "AmFlex drivers' transportation of goods wholly within a state are still a part of a continuous interstate transportation," the majority holds that "those drivers are engaged in interstate commerce for § 1's purposes." *Id.* at 22.

In my respectful view, this is not the best reading of the FAA. And it unfortunately creates difficult problems of application, as well as inequities among delivery workers who are similarly situated.[1]

---

[1] The majority also affirms the district court's determination that because the FAA does not apply, the entire arbitration provision in the parties' contract is invalid. Maj. Op. 31–33. Because I conclude the FAA does apply, I do not discuss this secondary issue in detail, except to note that to my mind, the district court's conclusion was premature. I do not believe the district court or the majority provide a sufficient basis for concluding that the parties would have scrapped their agreement to arbitrate altogether if they knew the FAA could not apply (state law could have governed the arbitration provision to which the parties clearly agreed). I would have remanded for further proceedings on this issue had I determined the FAA did not apply. In concluding otherwise, Maj. Op. 32 n.11, the majority parts from the First Circuit on this point. In *Waithaka v. Amazon.com, Inc.*, — F.3d —, 2020 WL 4034997, at *11 (1st Cir. 2020), and after holding that the FAA did not apply to a similar contractual provision, the court analyzed whether arbitration could "still be compelled pursuant to state law." *Id.* Although *Waithaka* ultimately held it could not, the majority does not engage in such an analysis and instead concludes "there is no law that governs the arbitration provision." Maj. Op. 32.

B

To answer the central question in this case, the place to start is the text of § 1. AmFlex workers are not "seamen" or "railroad employees," so if they are exempt from the FAA, it is because they fall within the residual clause of "any other class of workers engaged in foreign or interstate commerce." There are three basic options for how to interpret the residual clause in the case of delivery workers:

- Option 1: The residual clause covers any delivery person transporting anything between any two points. By this theory, because any delivery has some connection to interstate commerce, itself a broad concept under modern Commerce Clause doctrine, *see Gonzales v. Raich*, 545 U.S. 1 (2005); *Wickard v. Filburn*, 317 U.S. 111 (1942), it is fair to treat anyone making deliveries as "engaged in" interstate commerce. Even when a delivery is purely intrastate, that delivery must inevitably have an interstate nexus.

- Option 2: The residual clause does not require delivery workers to cross state lines in the course of their deliveries, but it also does not cover absolutely anyone who delivers anything (Option 1 above). Instead, it covers only *certain* intrastate delivery workers depending upon some other factors we identify, such as the nature of the company they work for, the nature of the goods that are transported, and/or whether the goods are delivered as part of a "continuous" interstate transportation. The majority follows Option 2.

- Option 3: Delivery persons are a "class of workers engaged in foreign or interstate commerce" if the class of workers crosses state or international lines in the course of their deliveries. This is Amazon's approach.

Which of these three options is the best reading of the statute?

We can begin by eliminating Option 1, because it faces serious resistance from Supreme Court precedent. Again, Option 1 would treat every delivery person as part of a "class of workers engaged in foreign or interstate commerce." This would seemingly include, to give examples nearer to the time of the FAA's enactment, a newspaper boy who delivers the evening post around his neighborhood, or the local milkman. The Supreme Court's decision in *Circuit City* confirms this broad reading of the residual clause is untenable. It is important to see why.

*First*, in holding that not all employment contracts fall within the § 1 exemption, *Circuit City* relied heavily on the difference between the statutory phrases "*engaged in* foreign or interstate commerce" (the § 1 exemption) and "*involving* commerce" (the broad § 2 FAA coverage provision). The Supreme Court explained that as a general matter, "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes." *Circuit City*, 532 U.S. at 115. These different modifiers allow Congress to calibrate the reach of its legislation. *Id.*

According to *Circuit City*, "considering the usual meaning of the word 'involving,' and the pro-arbitration purposes of the FAA," the phrase "involving commerce" in § 2 "'signals an intent to exercise Congress' commerce power to the full.'" *Id.* at 115 (quoting *Allied-Bruce*,

513 U.S. at 277).  Section 1, however, is different.  "Unlike" the phrase "involving commerce," "the specific phrase 'engaged in commerce' [is] understood to have a more limited reach."  *Id.* at 115–16 (citing *Jones v. United States*, 529 U.S. 848, 855 (2000); *Allied-Bruce*, 513 U.S. at 273; *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 279–80 (1975)).

It was on this basis that *Circuit City* concluded that "[t]he plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"  *Id.* at 118.  The premise of Option 1 above is that "engaged in foreign or interstate commerce" should cover any delivery person because at some level, every delivered good has an interstate nexus.  Option 1 encounters significant difficulty in the face of *Circuit City* because unlike the modifier "involving," "engaged in" does not signal Congress' intent to regulate to the fullest extent of the Commerce Clause.  *Id.* at 115–16, 118.

*Second*, Option 1 runs headlong into *Circuit City*'s approach to the residual clause in § 1.  *Circuit City* explained that because "the residual phrase" "any other class of workers engaged in foreign or interstate commerce" "follow[s] in the same sentence[] [an] explicit reference to 'seamen' and 'railroad employees,'" "[t]he wording of § 1 calls for the application of the maxim *ejusdem generis*."  *Id.* at 114.  Under that venerable canon, which reflects how language is commonly used, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Id.* at 114–15 (alteration in original) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17

(1991)); *see also* Scalia & Garner, Reading Law: The Interpretation of Legal Texts 199 (2012).

Based on this "rule of construction," *Circuit City* explained that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." 532 U.S. at 115. As noted above, the issue in *Circuit City* was whether the residual clause should cover any employment contract. *Id.* at 109. The answer was "no" because "[c]onstruing the residual phrase to exclude all employment contracts fails to give independent effect to the statute's enumeration of the specific categories of workers which precedes it." *Id.* at 114. The problem, in other words, was that "there would be no need for Congress to use the phrases 'seamen' and 'railroad employees' if those same classes of workers were subsumed within the meaning of the 'engaged in . . . commerce' residual clause." *Id.*

We can now see the second reason why the broad Option 1 above is, at the very least, in serious tension with *Circuit City*. As in *Circuit City*, if the residual clause covered anyone transporting anything over any distance, it is unclear why Congress would have specifically called out "seamen" or "railroad employees" in the statute. At the very least, the basis for the more stilted language in § 1 would be much more difficult to understand if the residual clause covered anyone transporting anything between any two locations.

## C

So what is the right answer here? The majority opinion is explicit that it is not purporting to adopt Option 1. It makes clear, for example, that delivery persons who deliver

food (through services like Doordash and Postmates) do not fall within the § 1 exemption.  Maj. Op. 23–25.  Instead, in holding that § 1 covers intrastate delivery workers who do not cross state lines in their deliveries but who transport packages that have previously traveled from out of state, the majority identifies certain features of AmFlex workers that supposedly bring them within § 1, yet render them different from just any delivery person.  This is Option 2 in my typology above.

In later sections, I discuss the problems with the majority's interpretation.  In this section, I explain why I think Amazon's interpretation (Option 3 above) is the most supportable one under the text of the FAA.  Though the statute does not clearly answer the question before us, the language of § 1 and the problems with the majority's alternative interpretation lead me to conclude that Amazon's reading is the most justified.

Once again, the statute provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  In the context of the FAA in particular, the Supreme Court has instructed that it is "a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quotation marks and alterations omitted).  And in discerning this ordinary meaning, courts may consider dictionary definitions from the relevant time.  *Id.*

As the majority agrees, Maj. Op. 11, dictionaries from the period when Congress enacted the FAA defined "engaged" as "[o]ccupied" or "employed."  *Engaged*, Webster's New International Dictionary 725 (1st ed. 1909);

*see also Engaged*, Webster's Collegiate Dictionary 333 (3d ed. 1919) (same); *Engagement*, Black's Law Dictionary (2d ed. 1910) (defining "engagement" as "[a] contract" or "obligation"). "Interstate commerce," meanwhile, was defined as "[t]raffic, intercourse, commercial trading, or the transportation of persons or property between or among the several states of the Union, or from or between points in one state and points in another state." *Interstate Commerce*, Black's Law Dictionary (2d ed. 1910); *see also Interstate Commerce*, Black's Law Dictionary (3d ed. 1933) (same).

Putting these definitions together most reasonably indicates that the § 1 exemption for a class of workers "engaged in . . . interstate commerce" applies to workers "[o]ccupied" or "employed" in the "transportation of . . . property . . . between points in one state and points in another state." *Engaged*, Webster's New International Dictionary 725 (1st ed. 1909); *Interstate Commerce*, Black's Law Dictionary (2d ed. 1910). In other words, a person who is "engaged in . . . interstate commerce" is one who is employed to do the thing that is the subject of the engagement, here "foreign or interstate commerce." With its focus on what workers are "employed" or "occupied" in, the statute thus most probably requires us to examine the work that the workers as a "class" perform.

At this point, we encounter a very reasonable disagreement between the parties. Amazon says that the work AmFlex delivery persons are "engaged in" is local delivery services. Plaintiff, by contrast, argues that the relevant work is the "last leg" intrastate delivery of packages that have previously traveled from out of state. Both are fair characterizations of work that AmFlex workers do. But I think Amazon's characterization is the better fit under this statute.

Section 1 is focused on whether the "class of workers" is "engaged in foreign or interstate commerce." As a matter of common parlance, and remembering *Circuit City*'s guidance on the narrowness of "engaged in," a "class" of delivery workers would more commonly "engage in" (*i.e.*, be employed in) "interstate commerce" by transporting goods across state lines. *See Wallace v. Grubhub Holdings, Inc.*, — F.3d —, 2020 WL 4463062, at *3 (7th Cir. 2020) ("[T]o fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders."). Plaintiff's characterization of AmFlex workers' "engagement" as workers delivering goods from out of state loses sight of the fact that the out-of-state nature of the goods is irrelevant to the actual work the AmFlex workers perform. While no one doubts that Amazon is of course engaged in interstate commerce (if that were the only question this would be a very easy case), the interstate provenance of Amazon packages does not affect the actual work that local AmFlex workers do. *See id.* (explaining that § 1 turns on "what the worker does" and not "where the goods have been").

Moreover, and as discussed in greater detail below, AmFlex workers do not just deliver packages. They also deliver groceries and restaurant meals from local businesses. Further, AmFlex only operates in select cities and AmFlex workers service only their local markets. All of this underscores that AmFlex workers are most naturally characterized as local delivery persons rather than "interstate" workers.

We can see how plaintiff's (and the majority's) interpretation of the FAA is less in accord with common language usage by applying their same interpretation to "foreign commerce." *See* 9 U.S.C. § 1 ("any other class of

workers engaged in *foreign* or interstate commerce") (emphasis added). Imagine someone orders a coffee grinder through Amazon's website. The coffee grinder is manufactured in China, travels across the Pacific Ocean on a container ship, and arrives at the Port of Long Beach. A truck driver then hauls it fifty miles north to an Amazon warehouse in the San Fernando Valley. Then an AmFlex worker picks it up from the warehouse and delivers it by bicycle to an apartment a few miles away.

Would we say that this AmFlex worker is "engaged in foreign commerce"? I doubt it. But by the reasoning of the majority opinion, the answer must be yes. Just as AmFlex workers carry "goods that remain in the stream of *interstate* commerce until they are delivered," Maj. Op. 21 (emphasis added), the same would need to be true of goods that traveled in *foreign* commerce as well. 9 U.S.C. § 1. In short, § 1's use of the modifier "engaged in" favors Amazon over plaintiff. The majority justifies its interpretation by saying that AmFlex drivers are "a part of a continuous interstate transportation." Maj. Op. 22. But that is not the language the statute uses.[2]

---

[2] It is also not enough for the majority to rely on a dictionary definition of the word "commerce" and conclude that an AmFlex worker is "not 'engaged in commerce' any less than a worker tasked with delivering goods between states." Maj. Op. 12. No one doubts that AmFlex workers are "engaged in commerce." But the statutory text refers to a "class of workers engaged in *foreign or interstate* commerce." In response, the majority points out that the FAA defines "commerce" to include foreign or interstate commerce. Maj. Op. 19 (citing 9 U.S.C. § 1). And the majority thus "see[s] no way to meaningfully distinguish between the word 'commerce' used in § 2"—in the phrase "involving commerce"—and "the 'foreign or interstate commerce' referenced in § 1." *Id.* This is all true enough. But it only confirms, as I discussed above, that what distinguishes "engaged in foreign or interstate

The statute's references to "seamen" and "railroad employees" support Amazon as well, at least more than they do the plaintiff. Neither of these classes of workers is defined in the statute with reference to the provenance of the goods (or people) they transport. Instead, the FAA casts them at a high level of generality, referring to the broad type of work they perform. Amazon's characterization of AmFlex workers' "engagement" is thus more consistent with the way the statute otherwise treats the "class[es] of workers" that are specifically enumerated.

In addition, and as noted above, *Circuit City* explained that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." 532 U.S. at 115. With a residual clause that applies to workers "engaged in foreign or interstate commerce," it is more appropriate to construe "seamen" and "railroad employees" as persons who operate in a cross-boundary capacity. The terms "seamen" and "railroad employees" are not only capable of that reading, such workers commonly (if not prototypically) do "engage in foreign or interstate commerce" in that manner. *See* Scalia & Garner, Reading Law 208 (2012) (using *ejusdem generis*, courts "[c]onsider the listed elements, as well as the broad term at the end, and ask what category would come into the reasonable person's mind"). Indeed, when it comes to the transportation of goods in particular, which is what AmFlex providers deliver, "seamen" and "railroad employees" traditionally operate

commerce" in § 1, and "involving commerce" in § 2, are the modifiers "engaged in" and "involving." And that is the distinction the Supreme Court identified in *Circuit City* as supporting a narrow construction of § 1. *See* 532 U.S. at 115.

across international and state boundaries (with a seaman more prone to foreign commerce and a railroad employee more likely to be engaged in interstate commerce, a parallelism that is in fact reflected in the text of § 1).

I recognize that not *every* "seaman" or "railroad employee" would necessarily be "engaged in foreign or interstate commerce." But that only goes to show that Congress in specifically exempting these particular "class[es] of workers" wanted to cover anyone who could meet that description. It does not change how we approach the meaning of the residual clause. We can always come up with examples that fit a statutory term in isolation but that largely defy its most common understanding in the context of the statutory scheme as a whole. Imagine a statute that said it was unlawful to bring any "knives, daggers, swords, or any other similar object onto an airplane." As a category, this most reasonably refers to objects that are dangerous because they are sharp. If someone brought a dull blade onto an airplane, it would likely still be treated as a "knife" and the statute would cover it. But that does not mean the residual clause would encompass things that are not traditionally sharp.

The linguistic intuition behind *ejusdem generis* is that terms in a statutory list that culminates in a residual clause should be construed in their most natural, categorical manners, in a way that reasonably reflects the boundaries the residual clause creates. *E.g.*, *Yates v. United States*, 574 U.S. 528, 545–46 (2015); *CSX Transp., Inc. v Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011). The statutory text in the FAA supports this approach because it refers to workers by their "*class*," reflecting the same paradigmatic approach as *ejusdem generis* itself. In this case, if the statute excluded

"seamen, railroad employees, and local delivery persons," it seems clear that one is quite a bit less like the others.

My interpretation of the FAA aligns with the recent decision in *Wallace v. Grubhub Holdings, Inc.*, — F.3d —, 2020 WL 4463062 (7th Cir. 2020), in which the Seventh Circuit held that § 1 did not cover Grubhub delivery drivers. There, the Seventh Circuit rejected the plaintiffs' theory that they came within the § 1 exemption because "they carry goods that have moved across state and even national lines." *Id.* at *3. The Seventh Circuit held that "to fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods *across state or national borders*." *Id.* (emphasis added); *see also id.* at *2 ("[W]e consider whether the interstate movement of goods is a central part of the class members' job description."); *id.* at *3 ("To show that they fall within this exception, the plaintiffs had to demonstrate that the interstate movement of goods is a central part of the job description of the class of workers to which they belong.").

Finally, Amazon's reading also yields an important benefit: it is relatively easy to apply. All we need to know is the extent to which delivery workers cross state or international lines in the course of their deliveries. The Supreme Court has cautioned against introducing "complexity and uncertainty [into] the construction of § 1" because it "undermin[es] the FAA's proarbitration purposes," "'breeding litigation from a statute that seeks to avoid it.'" *Circuit City*, 532 U.S. at 123 (quoting *Allied-Bruce*, 513 U.S. at 275). Amazon's reading of the FAA is much more consistent with this objective. The majority's interpretation, by contrast, foments substantial problems of practical application and produces inequities among similarly situated workers, issues I discuss below.

II

A

But what about the majority's differing interpretation? Again, the majority opinion rejects the Option 1 approach that all delivery workers are exempted from the FAA because the majority insists that persons who deliver food for restaurants through Doordash and similar services fall outside § 1. Maj. Op. 23–25. Instead the majority goes with Option 2: some local delivery providers working intrastate are within § 1, and we can discern which ones through application of factors we identify. In this case, the distinguishing features the majority identifies seem to be as follows:

- AmFlex workers work for Amazon: AmFlex workers are affiliated with Amazon, a large company devoted to working with its partners to transport items from all over the world that its customers purchase. Maj. Op. 21. Unlike restaurant delivery workers, "AmFlex workers complete the delivery of goods that Amazon ships across state lines and for which Amazon hires AmFlex workers to complete the delivery." *Id.* at 24.

- The interstate transportation is "continuous," and the transported packages do not "come to rest": "AmFlex drivers' transportation of goods wholly within a state are still a part of a continuous interstate transportation." *Id.* at 22‑23. "The packages are not held at warehouses for later sales to local retailers." *Id.* at 23. "Amazon packages do not 'come to rest' at Amazon

warehouses, and thus the interstate transactions do not conclude at those warehouses." *Id.* at 23.

- The packaged goods are not transformed into something else: restaurant delivery workers are different because "prepared meals from local restaurants are not a type of good that [is] indisputably part of the stream of commerce." *Id.* at 24 (quotations omitted). This presumably would be the case because "[i]ngredients contained in the food that [is] ultimately delivered from restaurants ended their interstate journey when they arrived at the restaurant where they were used to prepare meals." *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015); *see also* Maj. Op. 23–25 (citing *Levin* in explaining why Postmates and Doordash drivers do not fall within § 1).

- The nature of the transaction between Amazon and its own customers: "The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations." *Id.* at 23.

If we were drafting the FAA anew, some of these factors may well reflect reasonable bases for distinguishing AmFlex workers from other delivery persons. But the problem I have with the majority's analysis is that the factors it identifies have no apparent basis in the statute, which focuses on the work that a "class of workers" performs. *See Wallace*, 2020 WL 4463062, at *3. Section 1 exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Its coverage does not depend on the company

for whom the delivery person works. The statute likewise does not vary in application depending on the nature of the transaction between the underlying buyer and seller, *i.e.*, whether a good is delivered as part of a continuous journey from seller to customer, or has a retail stop in between, or whether it is a consumer transaction at all. Nor does the statutory text embrace a distinction between goods that "come to rest" after further transformation into something else.

The majority's Option 2 approach creates significant problems of workability and fairness, as I will detail below in Section III. But from a pure statutory interpretation perspective, what is important to see is that because the majority's limiting factors are not based in the statutory text (and are certainly not required by it), one can come up with alternative "limiting" factors that are not limiting at all, but that still have an equally plausible purchase on the language Congress drafted.

A good example is retail sales. The majority deems it significant that "[t]he packages are not held at warehouses for later sales to local retailers," but are part of a "continuous" delivery from Amazon to consumers. Maj. Op. 22–23. But if the statutory text "support[s] the conclusion that transportation workers need not cross state lines to be considered 'engaged in foreign or interstate commerce' pursuant to § 1," as the majority holds, *id.* at 11, what difference does it make if a delivery driver picks up a good from an Amazon warehouse or from a separate retailer? Section 1 focuses on the worker. And in both cases, the worker is transporting to a consumer a good that originated out of state. Indeed, the record indicates that Amazon "provides fulfillment services for third-party sellers who store inventory in Amazon Fulfillment Centers and sell

their products on Amazon's websites." It is unclear how the interstate transaction is "continuous" in these circumstances when Amazon itself is functioning as a retailer that keeps an "inventory" at its warehouses.

Another example is the majority's focus on the "package" that the end-use customer ordered as the relevant unit for analysis under the FAA. In the majority's view, the package does not "come to rest" at an Amazon warehouse because it is only temporarily housed there, untransformed, until an AmFlex worker picks it up. *Id.* at 23. By contrast, the majority suggests that ingredients for meals that restaurants prepare apparently do "come to rest" because the "prepared meals" themselves are not "indisputably part of the stream of commerce." *Id.* at 24 (quotations omitted).

The majority opinion's line-drawing depends on its selection of the relevant "unit" for commerce purposes. But once again, the statute does not tell us how to make that selection either. Imagine a tomato is transported from out of state to a restaurant and then used to make sauce for a pizza. Why is the later intrastate delivery of the pizza not also recognized as the final leg of an interstate delivery of the tomato? The customer wants a pizza of which the sauce is an indispensable ingredient and but for which the pizza would not be ordered. For commerce purposes, why focus on the local preparation of the completed pizza instead of recognizing that as a sum of its parts, the pizza is the product of goods that moved in interstate commerce? The text of the FAA does not help us choose between these various options.

Or we could look at it another way: imagine an Amazon customer orders a jar of pizza sauce through Amazon's website. *See* https://www.amazon.com/s?k=pizza+sauce&r ef=nb_sb_noss_2 (selection of pizza sauces available on Amazon) (last visited August 11, 2020). If the relevant

"interstate commerce" unit under the FAA were pallets of jars that are shipped to an Amazon warehouse and not the individual jars of sauce, then why doesn't the jar of sauce "come to rest" at the warehouse once labor is applied to it by removing the jar from the larger crate in which it was transported interstate?

The problems become only more difficult when we consider that the customer could order the same exact thing, wholly untransformed, from Amazon and the pizza shop. If Cherry Coke is manufactured out of state, what difference does it make from the perspective of the "class of workers" if the customer orders cans of Cherry Coke from the pizza shop or Amazon? *See* https://www.amazon.com/s?k=cherr y+coke&ref=nb_sb_noss_2 (selection of Cherry Coke options on Amazon website) (last visited August 11, 2020).

The point here is that if one broadens or narrows the lenses of the limiting factors that the majority identifies as part of its Option 2 approach, one can treat either more or fewer delivery workers as falling within § 1. The statutory text supports none of this line-drawing any more than any other, which is quite afield of the statute's focus on whether the work that the "class of workers" performs renders the "class" "engaged in foreign or interstate commerce." 9 U.S.C. § 1.

What this means is that in principle, the majority's Option 2 is no different than Option 1. But for the majority's own selection of factors it deems relevant to "interstate commerce," the majority's approach equally permits *any* delivery person to fall within § 1. And that is the expansive regime that faces the greatest resistance under the text of § 1, as construed in *Circuit City*. *See Wallace*, 2020 WL 4463062, at *3 (rejecting interpretation of § 1 that "would sweep in numerous categories of workers whose occupations

have nothing to do with interstate transport"). It would also stretch the supposedly "narrow" and "precise" § 1 exemption considerably, contrary to the FAA's overarching preference for arbitration. *Circuit City*, 532 U.S. at 118, 119.

## B

To reach its contrary interpretation of the FAA, the majority opinion spends considerable effort examining language in other statutes: the Federal Employers' Liability Act (FELA), the Clayton Act, and the Robinson-Patman Act. Maj. Op. 15–19. I do not think these other statutes can overcome the more natural import of the FAA's text, structure, and purpose.

The Supreme Court has cautioned that "[t]he phrase 'in commerce' does not, of course, necessarily have a uniform meaning whenever used by Congress." *Am. Bldg.*, 422 U.S. at 277. *Circuit City* made this same point about undue reliance on other "statutory jurisdictional formulations" when interpreting the FAA. *See* 532 U.S. at 118 (citing *Am. Bldg.*, 422 U.S. at 277). Instead, *Circuit City* instructed that courts must "construe the 'engaged in commerce' language in the FAA with reference to the statutory context in which it is found and in a manner consistent with the FAA's purpose." *Id.* It was that "statutory context" and "purpose" that the Supreme Court held "compel[led]" the conclusion "that the § 1 exclusion provision be afforded a narrow construction." *Id.*

FELA and the Clayton and Robinson-Patman Acts do not share the FAA's text, "context," or "purpose." The text of FELA (as it existed at the time of the FAA's enactment) provided that "every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury

while he is employed by such carrier in such commerce." 45 U.S.C. § 51 (1908). This statute is oriented more around the work of the "common carrier." And it lacks the FAA's specific structure and phrasing, in particular the references to "seamen" and "railroad employees" that give the § 1 residual clause some of its meaning. *See Circuit City*, 532 U.S. at 115. It is therefore hard to understand the First Circuit's conclusion, on which the majority relies, that the language of FELA and the FAA are "nearly identical." *Waithaka v. Amazon.com, Inc.*, — F.3d —, 2020 WL 4034997, at *6 (1st Cir. 2020). Indeed, the reference to "commerce" in both FELA and the antitrust statutes does not appear in a residual clause at all, much less in an exception to a general coverage provision. *See* 15 U.S.C. § 13(a) (Robinson-Patman Act); 15 U.S.C. §§ 14, 18 (Clayton Act); 45 U.S.C. § 51 (Federal Employers' Liability Act).

The identified purposes of these other statutes are also not comparable to the FAA's recognized objectives. FELA is a "broad remedial statute" that protects injured railroad workers. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987). For FELA, the Supreme Court has thus "adopted a 'standard of liberal construction in order to accomplish [Congress'] objects.'" *Id.* (alteration in original) (quoting *Urie v. Thompson*, 337 U.S. 163, 180 (1949)). FELA is therefore "not to be narrowed by refined reasoning" but "is to be construed liberally to fulfill the purposes for which it was enacted." *Jamison v. Encarnacion*, 281 U.S. 635, 640 (1930), *superseded by statute on other grounds as recognized in McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991).

The majority relies on the First Circuit's unsupported statement that "there is no indication that the remedial purpose of the FELA affected the Supreme Court's

conclusion" about which workers FELA covered.  Maj. Op. 15 n.2 (quoting *Waithaka*, 2020 WL 4034997, at *8).  But when the Supreme Court generally assigns a "liberal" construction to a statute based on its perceived "broad remedial" purposes, as it did in FELA, one would expect that interpretation to carry throughout the statute, and that reflects the import of some of the FELA cases the majority cites.  The more important observation from the FELA cases is that there is no indication, within an otherwise "broad remedial" statute, that the Supreme Court gave FELA's most closely analogous statutory language a "narrow" and "precise" construction, as we are required to do for the FAA § 1 exemption.  *Circuit City*, 532 U.S. at 118–19.

I also respectfully disagree with the majority's assertion that there is a "longstanding reliance on [FELA] to interpret the FAA's text."  Maj. Op. 28 n.9.  What the majority cites for this proposition is the First Circuit's very recent opinion in *Waithaka* and *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am.*, 207 F.2d 450 (3d Cir. 1953), in which the Third Circuit stated without explanation that Congress "must have had" FELA "in mind" when drafting the FAA.  *Id.* at 453.  For its part, the Supreme Court has never directed that the FAA be interpreted in light of FELA.  And if that were the "longstanding" law, current doctrine under the FAA would likely look completely different than it does today.

The context and identified purposes of the Clayton and Robinson-Patman Acts are equally inapt.  These antitrust statutes likewise have entirely different objectives, such as thwarting monopolistic practices and price discrimination (notably, the First Circuit in *Waithaka* did not rely on them to the extent the majority does here).  These antitrust regimes stand in contrast to § 1 of the FAA, which is a "narrow" and

"precise" exemption to Congress's otherwise "expansive" § 2 coverage provision seeking to "overcome judicial hostility to arbitration agreements." *Circuit City*, 532 U.S. at 118 (quoting *Allied-Bruce*, 513 U.S. at 272).

It is also not apparent that these other statutes the majority cites even support the majority's approach to the FAA. In the case of FELA, the majority cites *Shanks v. Delaware, Lackawanna & Western Railroad Co.*, 239 U.S. 556 (1916). Maj. Op. 15. But *Shanks* held that a railroad employee was *not* engaged in interstate commerce, and thus not subject to FELA, when he was injured while repairing a "heavy shop fixture" used to power equipment that serviced interstate trains. *Shanks*, 239 U.S. at 558. *Shanks* relied on *Illinois Central Railroad Co. v. Behrens*, 233 U.S. 473 (1914), where the Supreme Court similarly held that "a member of a crew attached to a switch engine [that] operated exclusively within the city of New Orleans" was not engaged in interstate commerce, even though the railroad company transported interstate freight and the employee at the time of his death was about to move train cars that were destined for interstate transport. *Id.* at 476–78. All of this line drawing eventually created so "much confusion" that after decades of difficulties, Congress to simplify matters just revised FELA altogether. *S. Pac. Co. v. Gileo*, 351 U.S. 493, 497 (1956); Maj. Op. 15 n.2. This is not what we should aspire to for the FAA.

Of course, neither the majority nor the First Circuit identified FELA cases from the relevant time period involving "last leg" delivery workers like those here. The closest case from this period appears to have been a Commerce Clause case, *New York ex rel. Pennsylvania Railroad Co. v. Knight*, 192 U.S. 21 (1904), which cuts against the majority's position. There, an interstate railroad

company operated a horse-drawn cab business within New York City that transported its passengers to and from their homes or hotels to a ferry landing. *Id.* at 25. The railroad argued it was not subject to a state tax because the cab service was a part of its overall interstate transportation. *Id.* The Supreme Court disagreed and held that the local cab service was not "engaged in interstate transportation" because it was "exclusively rendered within the limits of the city." *Id.* at 26, 28. In reaching this conclusion, the Supreme Court rejected the company's alternative view and asked, "If the cab service is interstate transportation, are the drivers of the cabs . . . also engaged in interstate commerce? And where will the limit be placed?" *Id.* at 28. The majority tries to distinguish *Knight* as relevant only for "taxation purposes," Maj. Op. 22, but why wouldn't FELA cases then be relevant only for FELA? The key point is that early cases involving the Supreme Court's struggles to capture the meaning of interstate commerce in FELA and otherwise thus at best point in different directions and make them uncertain guideposts for the scope of FAA § 1.

The cases the majority cites from the antitrust context, *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974), and *United States v. American Building Maintenance Industries*, 422 U.S. 271 (1975), also do not move the needle. Maj. Op. 17–18 & n.3. The statutes at issue there did not focus on workers or their work, but on defendants that are typically companies, whose engagement with interstate commerce is therefore qualitatively different. *See* 15 U.S.C. §§ 13(a), 14, 18. When these antitrust cases discussed the "flow of interstate commerce," it was thus in the context of "a corporation" that "must itself be directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." *Am. Bldg.*, 422 U.S. at 283 (citing *Gulf Oil*, 419 U.S. at 195). This is a

seemingly broader definition of "engaged in" than even the majority is willing to tolerate for § 1.  *See* Maj. Op. 18 n.3. And it has no apparent alignment with the statute before us, making its relevance to this case entirely unclear.

Even so, *Gulf Oil* held that "entirely intrastate sales of asphaltic concrete" did *not* reflect corporate activity "engaged in" interstate commerce, even though the concrete was used "in the construction of interstate highways" and sold to "interstate highway contractors."  419 U.S. at 188, 196, 199.  *American Building* similarly held that the janitorial service company at issue there was *not* "engaged in" interstate commerce.  422 U.S. at 283–84.  In fact, and in language reminiscent of this case, *American Building* noted that "simply supplying localized services to a corporation engaged in interstate commerce" did not satisfy the applicable "in commerce" requirement of the Clayton Act. *Id.* at 283.

I thus find it difficult to infer from antitrust cases *curbing* the "in commerce" requirement a congressional intent to *expand* the FAA's narrow exemption for certain transportation workers.  Indeed, *Circuit City* relied on *Gulf Oil* and *American Building* in explaining why the phrase "engaged in foreign or interstate commerce" should be construed narrowly.  *See Circuit City*, 532 U.S. at 117–18. It did not look to these cases to interpret § 1 in the way the majority does.

## C

Also overstated is the majority's attempt to rely on cases from other circuits and district courts.  Maj. Op. 12–14.  The majority states that its "reading of the statutory text is reinforced by decisions of other circuits and our own that have applied the exemption."  Maj. Op. 12.  But aside from

the recent decisions in *Waithaka* and *Wallace*, no court of appeals has yet addressed issues comparable to the ones we decide today.[3]  The only Ninth Circuit case of any relevance is *Harden v. Roadway Package Systems*, 249 F.3d 1137 (9th Cir. 2001), which held that the plaintiff, a delivery driver, was "engaged in" interstate commerce and exempt from the FAA because he "contracted to deliver packages throughout the United States, with connecting international service." *Id.* at 1140 (quotations omitted).  We did not focus on whether the goods had previously traveled in interstate commerce or whether the company generally was engaged in interstate commerce, as the court does today.  Maj. Op. 21, 26.  And AmFlex workers have not entered contracts containing similar language.

The majority speculates that it is "more plausible" that the driver in *Harden* "made last-mile deliveries wholly within a given state," Maj. Op. 27 n.8.  But nothing on the face of *Harden* supports this.  And unsurprisingly, given its discussion of deliveries made "throughout the United States, with connecting international service," *Harden* has long been understood as a case about interstate delivery workers. *See e.g.*, *Fuentes v. Rush Truck Ctrs. of Cal., Inc.*, 2019 WL 3240100, at \*4 (C.D. Cal. March 11, 2019) (citing *Harden* for the proposition that "[i]nterstate truck drivers, directly responsible for transporting goods across state lines, fall squarely in the category of transportation workers"); *Veliz v. Cintas Corp.*, 2004 WL 2452851, at \*5 (N.D. Cal. April 5,

---

[3] While *Wallace* acknowledged that *Waithaka* was a "harder" case, *Wallace*, 2020 WL 4463062, at \*2, the reasoning of *Wallace* is plainly inconsistent with both the majority opinion here and *Waithaka*.  *Wallace* made clear that § 1 does not turn on whether the goods previously traveled in interstate commerce.  *See id.* at \*3 (rejecting the theory that "the residual exemption is not so much about what the worker does as about where the goods have been").

2004) (citing *Harden* for the proposition that "[t]he most obvious case where a plaintiff falls under the FAA exemption is where the plaintiff directly transports goods [ ] interstate, such as [an] interstate truck driver whose primary function is to deliver mailing packages from one state into another").

The cases from other circuits that the majority relies on do not support its holding because they addressed other issues. *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348, 351 (8th Cir. 2005), *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005), and *Cole v. Burns International Security Services*, 105 F.3d 1465, 1470–71 (D.C. Cir. 1997), all concerned the threshold questions whether an employee was a transportation worker or whether § 1 was limited to transportation workers (which the Supreme Court later answered "yes" in *Circuit City*).

The majority's reliance on *Palcko v. Airborne Express, Inc.*, 372 F.3d 588 (3d Cir. 2004), is similarly overstated. There, the Third Circuit held that a "direct supervisor" of "drivers that transported packages" for a company "engage[d] in intrastate, interstate, and international shipping" was covered by the § 1 exemption. *Id.* at 590, 594 n.2. In the Third Circuit's view, such a person was "so closely related [to interstate commerce] as to be in practical effect part of it." *Id.* at 593 (quotations and brackets omitted).

In *Palcko*, the Third Circuit apparently suggested that § 1 applies to workers who "engage in interstate commerce" *or* "in work so closely related thereto." *Id.* (quotations omitted); *see also Singh v. Uber Techs. Inc.*, 939 F.3d 210, 214 (3d Cir. 2019) ("[T]he residual clause of § 1 may extend to a class of transportation workers who transport passengers, so long as they are engaged in interstate

commerce or in work so closely related thereto as to be in practical effect part of it."); Maj. Op. 13 n.1. That is just an expansion of the actual language in § 1, and it lacks justification for that reason. Indeed, this approach is most akin to my Option 1.

But even so, properly considered, *Palcko* stands only for the proposition that to fall within the § 1 residual clause, crossing state or international lines may not be required for certain classes of workers that supervise interstate transportation. *See Palcko*, 372 F.3d at 594 n.2. That is a very different question than whether local delivery *drivers* are exempt from the FAA, based on whether and how *their* work renders them a "class of workers engaged in" interstate commerce. That is a question on which *Palcko* sheds no light.

Indeed, in a later case, the Third Circuit remanded for further discovery on the question of whether Uber drivers "engaged in" interstate commerce under § 1, because the plaintiff had "place[d] the issue in dispute" by "aver[ring] that he frequently transported passengers on the highway *across state lines*, between New York and New Jersey." *Singh*, 939 F.3d at 226 (emphasis added). The Third Circuit thus appears to have recognized that when it comes to workers who make deliveries (of people or goods), and unlike the supervisor in *Palcko*, the analysis under § 1 turns on the extent to which the class of workers crosses state lines in the course of their deliveries. That is the approach I would have followed here as to AmFlex workers, who are more analogous to Uber drivers than to the supervisor in *Palcko*.

The Seventh Circuit followed a similar approach in *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012). That case involved truck drivers at an Illinois concrete company

who argued they were exempt from the FAA under § 1. *Id.* at 956. The Seventh Circuit treated the case as turning on whether the "trucking employees' activities were strictly limited to three counties in southern Illinois" or, instead, "whether the truckers ever carried loads into Missouri or other States." *Id.* Because discovery demonstrated that these workers "cross[ed] state lines" in a sufficient amount, they fell within § 1. *Id.* at 957.

Finally, like its circuit court authority, the majority's reliance on district court decisions is also overstated. While the majority claims that district courts "have also understood § 1 not to require that a worker cross state lines," Maj. Op. 13, many other district courts have held the opposite in cases involving delivery workers who transported goods, restaurant food, and passengers. *See Rogers v. Lyft, Inc.*, — F. Supp. 3d —, 2020 WL 1684151, at *6 (N.D. Cal. April 7, 2020); *Grice v. Uber Techs., Inc.*, 2020 WL 497487, at *6 (C.D. Cal. Jan. 7, 2020); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal. 2018); *Bonner v. Mich. Logistics Inc.*, 250 F. Supp. 3d 388, 397 (D. Ariz. 2017); *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *4–5 (N.D. Cal. Mar. 14, 2016); *Levin*, 146 F. Supp. 3d at 1152. The majority thus errs in suggesting that the weight of authority is on its side.

III

Finally, the majority's approach suffers from serious problems of practical application, while treating similarly situated workers unequally. These are two significant sets of downsides for an interpretation of the FAA that is already not the best reading of the statutory text.

As to workability: Whereas Amazon's approach requires a relatively straightforward inquiry into the extent to which

AmFlex workers crossed state lines in the course of their deliveries, the majority's approach requires examination into where shipped goods originated, whether an underlying transaction is "continuous," and where items "come to rest."

Demonstrating the extent to which shipped goods originated out of state strikes me as a potentially difficult inquiry. Although one would assume AmFlex workers are delivering at least some goods that came to an Amazon warehouse from outside the States in which they are located, I am not aware of evidence on this issue, and the majority assumes the point. Maj. Op. 21. The assumption seems plausible enough in the context of Amazon, but the rule the majority sets forth will need to be applied to delivery workers for businesses other than Amazon, and those businesses may be less integrated and less national in scope. Furniture stores or florists come to mind. Having extensive discovery on where goods originated just to determine arbitrability is contrary to the purpose of the FAA. *See Allied-Bruce*, 513 U.S. at 275. Amazon's approach may require some discovery too, but that discovery will likely be more contained and is at least based on the FAA's focus on the "class of workers."

The need to determine, under the majority opinion, whether the interstate transaction was "continuous," or whether the items "came to rest" earlier, strikes me as even more problematic. The "come to rest" doctrine has been sourced to *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). *See* Maj. Op. 23. In *Schechter Poultry*, the Supreme Court held that the transactions at issue were *not* "in interstate commerce" because the goods had "come to a permanent rest" within New York and were "not destined for transportation to other States." 295 U.S. at 543.

In this respect, *Schechter Poultry* would seem to support Amazon.

But the more fundamental point is that importing a "come to rest" doctrine into the FAA is ill-advised. *Schechter Poultry* was an exemplar of an earlier era in which the Supreme Court made attempts to place limits on Congress' power under the Commerce Clause through doctrinal devices that sought to capture where interstate commerce supposedly began and ended as part of assessing whether effects on interstate commerce were direct or indirect. *See id.* While perhaps well-intentioned, this approach proved difficult to apply and was effectively abandoned. *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–38 (1937); *see also United States v. Lopez*, 514 U.S. 549, 555 (1995).

Resurrecting this approach now in the context of the FAA's transportation worker exemption is not justified. The difficulty lies in the fact that determining whether an interstate transaction is "continuous," or where an item in transit "came to rest," is more a matter of metaphysics than legal reasoning. If a tomato was shipped out of state to the pizzeria, in what sense did it truly "come to rest" there? What if the tomato spent only 24 hours at the pizzeria before being made into sauce, but Amazon held an item in inventory for six months at an Amazon warehouse before an order from a nearby customer was placed and an AmFlex worker picked it up and delivered it? Is one chain of events more "continuous" than the other? And if a good is shipped from a manufacturer to a storefront retailer, why does its "rest" begin at the retailer, while an Amazon-purchased good only "rests" once it gets to the consumer?

The record suggests that AmFlex workers sometimes pick up items from grocery stores or other local merchants

and deliver them to customers through Amazon Fresh or Prime Now, related Amazon services. Is a grocery store more akin to a restaurant where food items apparently "come to rest," or a warehouse where they do not? Does it matter if a customer orders a pre-packaged pound of Swiss cheese or a pound of Swiss cheese sliced at the deli counter, where the cheese is mixed with labor and transformed to some degree?[4]

The point is that these are all difficult inquiries that have no right answer, at least according to the tools available to lawyers and judges. Undertaking such confounding inquiries in the context of the FAA is particularly undesirable when the result will inevitably mean more complex civil litigation over the availability of a private dispute resolution mechanism that is supposed to itself reduce costs. *See Circuit City*, 532 U.S. at 123; *Allied-Bruce*, 513 U.S. at 275.

As to fairness: In a § 1 exemption that is focused on "class[es] of workers," the majority's approach produces the inequitable result that workers performing the same work are subject to different legal regimes. AmFlex delivery persons and food service delivery workers from companies like Doordash both make local deliveries. But under the majority opinion, the former delivery workers are exempt from the FAA, whereas the latter are fnot. *See* Maj. Op. 23–25. It is hard to understand why that should be the case when from the perspective of the local delivery person, whether he is

---

[4] Even the plaintiff recognizes that AmFlex workers perform "pick ups and deliveries from local merchants" through Amazon's Prime Now and Amazon Fresh services. Plaintiff thus suggests this court "could limit its ruling to exclude the Amazon Fresh and Prime Now services." The majority opinion instead holds, without limitation, that "AmFlex delivery providers fall within the [§ 1] exemption." Maj. Op. 28.

delivering goods from out of state is irrelevant to his work. *See Wallace*, 2020 WL 4463062, at *3.

This inequity comes into sharper relief when considering that food service delivery workers drop off items for restaurants that one could also order on Amazon. These items (like my earlier example of cans of Cherry Coke) are not in any way transformed into something else at the restaurant. But unlike his Doordash counterpart, the AmFlex driver who drops off the Cherry Coke after retrieving it from an Amazon warehouse is not subject to arbitration under the majority opinion. Local delivery drivers dropping off the exact same item that originated out of state are thus subjected to very different legal regimes, for reasons that have nothing to do with the on-the-ground work they perform.

Indeed, and perhaps ironically, the record shows that AmFlex workers *themselves* deliver restaurant orders. The contract at the center of this dispute instructs AmFlex workers to "use an insulated bag when delivering restaurant orders" and to "not leave chilled/frozen items unattended." In the district court, an AmFlex director submitted a declaration stating that AmFlex workers "can deliver restaurant orders." Decl. of Piyush Lumba ¶ 9, *Rittmann v. Amazon.com, Inc.*, No. 2:16-cv-01554-JCC (W.D. Wash.), ECF No. 49. And declarations from AmFlex delivery providers confirm they do so. *See, e.g.*, Decl. of Michelle Prevette ¶ 9, *Rittmann v. Amazon.com, Inc.*, No. 2:16-cv-01554-JCC (W.D. Wash.), ECF No. 54 (explaining she used "insulated bags for [her] work with Amazon" when making "hot and cold food deliveries"); Decl. of Thyais R.J. Meade ¶ 14, *Rittmann v. Amazon.com, Inc.*, No. 2:16-cv-01554-JCC (W.D. Wash.), ECF No. 57 ("I have had a time during a restaurant delivery where Amazon dispatch contacted me (at first, with a canned message) to let me know that the

restaurant delivery was not ready yet."). This means that AmFlex workers are treated differently than Doordash drivers even though both deliver meals from local restaurants.

The inequities become even stranger when one considers that delivery workers often work for multiple services, even at the same time (think of drivers with both Uber and Lyft stickers on their windshields). An AmFlex worker who also works for Doordash and is doing the same basic work for both companies would thus be subject to arbitration based on which company's "hat" he is wearing.

Indeed, Lawson, the named plaintiff at issue here, himself drove for Uber and Lyft and worked for food delivery companies Postmates, Caviar, and Grubhub. *See Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1073 (N.D. Cal. 2018). He worked for several of these companies at the same time. *Id.* at 1074. Lawson was able to file a lawsuit in federal court against Grubhub because he opted out of his arbitration agreement with that company. *See id.* at 1072. But under the majority's opinion, had he not opted out, as a food delivery person Lawson apparently would not have been covered by the § 1 transportation worker exemption and could have been required to arbitrate his claim with Grubhub. Under the majority opinion, therefore, the same person performing the same type of work at the same time through the same means is required to arbitrate against some employers but not others. Suffice to say, it is hard to locate such a regime in the language Congress used in § 1.

*       *       *

I would have held that the district court erred in denying Amazon's motion to compel arbitration. I therefore respectfully dissent.